IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LUKE LEFEVER, | **4:20CV3066** |
| Plaintiff, | |
| vs. | **MEMORANDUM AND ORDER** |
| IVAN CASTELLANOS, Dawson County Deputy, in his individual capacity; COUNTY OF DAWSON, NEBRASKA; JEROME KRAMER, Lincoln County Sheriff, in his official and individual capacities; DEPUTY ROLAND KRAMER, Chief Deputy, in his individual capacity; BRETT SCHMIDT, Deputy, in his individual capacity; COUNTY OF LINCOLN, NEBRASKA; CARLOS TREVINO, Nebraska State Patrol Trooper, in his individual capacity; and ELWOOD, Nebraska State Patrol Trooper Sgt., in his individual capacity, | |
| Defendants. | |

This matter is before the court on Defendants' motions for summary judgment (Filings 101, 104, 107) and on four related motions filed by Plaintiff (Filings 127, 133, 138, 139).

## I. INTRODUCTION

Plaintiff, Luke LeFever ("LeFever"), a state prisoner who appears pro se, filed three separate actions on June 11, 2020, which were then consolidated on the court's own motion, as involving common questions of law or fact. An initial review of LeFever's original Complaints (Filing 1 in Case Nos. 4:20CV3066, 4:20CV3067, and 4:20CV3068) resulted in a determination by the court that they were subject to dismissal under 28 U.S.C. §§ 1915(e)(2) and 1915A; however, LeFever was given leave to amend.

The court later conducted an initial review of LeFever's Amended Complaint (Filing 10), which was not filed until November 23, 2020. The court summarized that pleading as follows:

> LeFever alleges that on June 4, 2018, he had a roadside encounter with Deputy Ivan Castellanos of the Dawson County Sheriff's Office, and was searched with his consent. After being told he was not under arrest, LeFever began to walk away but was tased in the back by Deputy Castellanos. LeFever fell to the ground and was given repeated shocks, but was able to regain his feet, pull out the taser wires, and run away. Deputy Castellanos discharged his sidearm at the fleeing LeFever, but missed. [LeFever] alleges Deputy Castellanos then made radio reports in which he falsely claimed LeFever had weapons and there had been "shots fired." As a result of these allegedly false radio reports, LeFever claims other law enforcement officers pursued and apprehended him using deadly force. Those officers fired 68 rounds of ammunition into a vehicle LeFever was driving, and he was struck with 9 of these rounds.

> LeFever alleges he wound up in a pasture, where the vehicle he was driving was intentionally T-boned by Trooper Carlos Trevino of the Nebraska State Patrol ("NSP"), who drove through a fence with his patrol truck. When LeFever's vehicle began moving again, Trooper Trevino and three officers from the Lincoln County Sheriff's Office, including Sheriff Jerome Kramer, Chief Deputy Roland Kramer, and Deputy Brett Schmidt, began firing their weapons at the vehicle.

Memorandum and Order entered February 4, 2021 (Filing 14), p. 2.

The court determined that seven plausible claims for relief under 42 U.S.C. § 1983 were stated in the Amended Complaint:

> (1) a Fourth Amendment "excessive force" claim against Deputy Castellanos, in his individual capacity, for tasing LeFever; (2) a Fourteenth Amendment substantive due process claim against Deputy Castellanos, in his individual capacity, for firing his service weapon at LeFever; (3) a Fourth Amendment "false arrest" claim against Deputy Castellanos, in his individual capacity, for radioing there were "shots fired" and LeFever was armed; (4) a Fourth Amendment "excessive force" claim against Sheriff Kramer, in his individual and official capacities, for firing rounds of ammunition into the vehicle LeFever

2

was driving, and for condoning his deputies' use of deadly force against LeFever; (5) a Fourth Amendment "excessive force" claim against Chief Deputy Kramer, in his individual capacity, for firing rounds of ammunition into the vehicle LeFever was driving; (6) a Fourth Amendment "excessive force" claim against Deputy Schmidt, in his individual capacity, for firing rounds of ammunition into the vehicle LeFever was driving; and (7) a Fourth Amendment "excessive force" claim against Trooper Trevino, in his individual capacity, for crashing into the vehicle LeFever was driving and then firing rounds of ammunition into the vehicle.

*Ibid*., pp. 18-19.

The court dismissed without prejudice all state-law claims alleged against Trooper Trevino, because of Eleventh Amendment immunity. *Ibid*., pp. 15, 19. In addition, the court dismissed without prejudice all claims (state and federal) alleged against another state patrolman, Sergeant Elwood, for failure to state a claim upon which relief may be granted.[1] *Ibid*. pp. 15-17, 19. The court did not address whether state-law claims alleged against other Defendants (county law enforcement officers) were well-pleaded, but all official-capacity claims alleged against them were dismissed without prejudice. *Ibid*., pp. 17-19. The court had previously dismissed with prejudice all federal constitutional claims alleged against Trooper Trevino in his official capacity under 42 U.S.C. § 1983. See Memorandum and Order entered August 3, 2020 (Filing 7), pp. 19-20, 25.[2]

On April 27, 2021, Deputy Castellanos filed an Answer to the Amended Complaint in his individual capacity (Filing 27), and Dawson County filed a motion to dismiss with prejudice all state-law claims alleged against Deputy Castellanos in his official capacity (Filing 28). On May 28, 2021, Sheriff Jerome Kramer, Chief Deputy Roland Kramer, and Deputy Schmidt jointly filed an Answer to the Amended Complaint (Filing 30), and Lincoln County filed a motion to dismiss with prejudice all state-law claims alleged against these three Defendants in their official capacities (Filing 31). Subsequently, the court gave Dawson County and Lincoln County leave to intervene and granted their motions to dismiss the state-law claims as barred by the intentional torts exception to Nebraska's Political Subdivisions Tort

---

[1] Elwood was not served with summons, and has not entered an appearance.

[2] No judgment was entered in connection with either initial review.

Claims Act; consequently, all state-law claims alleged against the counties and their employees were dismissed with prejudice.[3] See Memoranda and Orders entered September 13, 2021 (Filings 54, 55).[4] After a default judgment entered against Trooper Trevino in his individual capacity was set aside upon a showing of excusable neglect, he filed an Answer on August 8, 2021 (Filing 48). Defendants' Answers all include claims of qualified immunity.[5]

## II. SUMMARY JUDGMENT STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).

In reviewing a motion for summary judgment, the court views the facts in the light most favorable to the non-moving party and gives that party "the benefit of all reasonable inferences that can be drawn from the record." *State Nat'l Ins. Co., Inc. v. Washington Int'l Ins. Co.*, 304 F. Supp. 3d 827, 831-32 (D. Neb. 2018) (quoting *Minnesota ex rel. N. Pac Ctr., Inc. v. BNSF Ry. Co.*, 686 F.3d 567, 571 (8th Cir. 2012)). It is not the court's function to weigh evidence in the summary judgment record to determine the truth of any factual issue; the court merely determines

---

[3] "The requirements of the Political Subdivisions Tort Claims Act apply where an individual is sued in his or her individual capacity, but is performing within the scope of employment." *Cole v. Wilson*, 627 N.W.2d 140, 144 (Neb. App. 2001). What this statement really means is that "[c]laims against a political subdivision employee for acts and omissions performed in the course and scope of employment are deemed actions against the county and not the employee personally." *Jaso v. Schlemat*, No. 4:19CV3106, 2020 WL 1914941, at *9 (D. Neb. Apr. 20, 2020) (quoting *Foell v. Cty. of Lincoln*, No. 4:17CV3044, 2019 WL 2996276, at *14 (D. Neb. July 9, 2019).

[4] The court again withheld entry of judgment.

[5] "[A]n official sued in his official capacity may not take advantage of a qualified immunity defense." *Mitchell v. Forsyth*, 472 U.S. 511, 556 n. 10 (1985) (citing *Brandon v. Holt*, 469 U.S. 464 (1985)). Thus, the official-capacity claim against Sheriff Kramer is not subject to this defense.

whether there is evidence creating a genuine issue for trial.  *See Bell v. Conopco, Inc.*, 186 F.3d 1099, 1101 (8th Cir. 1999).

"There is a genuine dispute when the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (internal quotations and citations omitted). "A fact is material if it 'might affect the outcome of the suit.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the initial responsibility of informing the court of the basis for the motion, and must identify those portions of the record which the moving party believes show the lack of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the moving party does so, the burden then shifts to the nonmoving party, who "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. If the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment should be granted. *Smith-Bunge v. Wisconsin Cent., Ltd.,* 946 F.3d 420, 424 (8th Cir. 2019).

The initial burden on a moving party "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) ("The moving party can satisfy its burden in either of two ways: it can produce evidence negating an essential element of the nonmoving party's case, or it can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial."); *Johnson v. Wheeling Mach. Prods*., 779 F.3d 514, 517 (8th Cir. 2015) (moving party need not produce evidence showing "the absence of a genuine issue of material fact.").

In response to the moving party's showing, the nonmoving party's burden is to produce "specific facts sufficient to raise a genuine issue for trial." *Haggenmiller v. ABM Parking Servs., Inc.,* 837 F.3d 879, 884 (8th Cir. 2016) (quoting *Gibson v. Am. Greetings Corp.,* 670 F.3d 844, 853 (8th Cir. 2012)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a

genuine issue for trial." *Wagner v. Gallup, Inc*., 788 F.3d 877, 882 (8th Cir. 2015)
(quoting *Torgerson*, 643 F.3d at 1042).

## III. SUMMARY JUDGMENT PROCEDURE

A party asserting that a fact cannot be or is genuinely disputed must support
the assertion by:

> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the
> motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or
> presence of a genuine dispute, or that an adverse party cannot produce
> admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

This court's local rules further specify that "[t]he moving party must include
in the brief in support of the summary judgment motion a separate statement of
material facts," which "should consist of short numbered paragraphs, each
containing pinpoint references to affidavits, pleadings, discovery responses,
deposition testimony (by page and line), or other materials that support the material
facts stated in the paragraph." NECivR 56.1(a) (underlining omitted). The opposing
party's brief must include "a concise response to the moving party's statement of
material facts." NECivR 56.1(b)(1). "Each material fact in the response must be set
forth in a separate numbered paragraph, must include pinpoint references to
affidavits, pleadings, discovery responses, deposition testimony (by page and line),
or other materials upon which the opposing party relies, and, if applicable, must state
the number of the paragraph in the movant's statement of material facts that is
disputed." *Id.*[6]

---

[6] The primary purpose of these rules "is to distill to a manageable volume the
matters that must be reviewed by a court undertaking to decide whether a genuine
issue of fact exists for trial. They are designed to prevent a district court from
engaging in the proverbial search for a needle in the haystack." *Jones v. United
Parcel Serv., Inc.,* 461 F.3d 982, 990 (8th Cir. 2006) (cleaned up). "Courts have
neither the duty nor the time to investigate the record in search of an unidentified

6

A party's failure to comply with these requirements can have serious consequences: The moving party's "[f]ailure to submit a statement of facts" or "[f]ailure to provide citations to the exact locations in the record supporting the factual allegations may be grounds to deny the motion" for summary judgment. NECivR 56.1(a) (underlining omitted). On the other hand, "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response." NECivR 56.1(b)(1) (underlining omitted).[7]

Even though LeFever is proceeding pro se, he is bound by and must comply with all local and federal procedural rules. NEGenR 1.3(g); *see Bunch v. Univ. of Ark. Bd. of Trs.*, 863 F.3d 1062, 1067 (8th Cir. 2017) (status as pro se litigant does not excuse noncompliance with local rules regarding summary judgment).

## IV. PLAINTIFFS' RESPONSIVE FILINGS

In response to Defendants' motions for summary judgment, LeFever has filed a motion in opposition with an evidentiary index (Filings 127, 128); three opposing briefs (Filings 129, 130, 131); an opposing "declaration" (Filing 132); an objection to certain video evidence (Filing 133); a "separate statement of disputed factual issues" (Filing 134); a "motion to amend or replace pleadings," as supplemented (Filings 138, 142); and a motion to appoint counsel, with supporting memorandum of law and "declaration" (Filings 139, 140, 141). LeFever appears to have submitted Filings 127 through 134 as a single document (see table of contents at Filing 127, p. 3), but they have been docketed separately for clarity. Filings 138 through 142 were received by the court and filed on September 12, 2020, two weeks after Defendants' reply briefs were filed.. Four of the filings (127, 133, 138, and 139) will be treated as motions. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made

---

genuine issue of material fact to support a claim or a defense." *Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007).

[7] "Nebraska's rule concerning summary judgment procedure places clear requirements on the moving and opposing parties." *Tramp v. Assoc. Underwriters, Inc.*, 768 F.3d 793, 799 (8th Cir. 2014). "[T]he rules clearly require that [the opposing party] respond in kind, and in a specific fashion, to the statement of undisputed facts asserted by [the moving parties] in their motion for summary judgment." *Id.* (holding district court properly considered the movant's statement of facts admitted where opposing party did not comply with NECivR 56.1(b)(1)).

by motion."). For the reasons discussed next, all four motions will be denied and the court will then proceed to analyze Defendants' summary judgment motions.

## A. Filing 127

LeFever has filed a motion requesting that Defendants' motions for summary judgment be denied as to all of his claims. This is not a proper filing and is not entitled to any consideration under the court's local rules. *See* NECivR 7.1(b)(1)(A) ("The party opposing a motion must not file an 'answer,' 'opposition,' 'objection,' or 'response,' or any similarly titled responsive filing. Rather, the party must file a brief that concisely states the reasons for opposing the motion and cites to supporting authority."); *see also Guinn v. Clift*, No. 4:18CV3024, 2019 WL 7020743, at *1 n. 1 (D. Neb. July 15, 2019) (striking motion in opposition to summary judgment motion as an improper filing). Filing 127 therefore will be denied. The court has, however, given due consideration to LeFever's briefs and associated filings.

## B. Filing 133

LeFever objects to "Castellanos' dash camera video" (Filing 103, Exhibit A to Castellanos' Affidavit) and to "Trevino's dash and body camera's videos" (Filing 105, Exhibit A to Trevino's Affidavit), and requests that the DVDs containing such video evidence not be admitted into the record. Copies of this evidence were mailed to LeFever, but he says the DVDs were labeled contraband by prison staff and held in the mailroom. LeFever complains that the Nebraska Department of Correctional Services ("NDCS") "also refuses to provide [him] with the means to be able to view the DVD evidence provided by Defendants Castellanos and Trevino." Filing 133, ¶¶ 1-4. This is not a valid reason for exclusion of evidence. *See* Fed. R. Evid. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court.").

The evidence has been properly authenticated by Defendants Castellanos and Trevino in their affidavits (see Filing 102-1, ¶ 4; Filing 105-1, ¶ 1), and will be considered by the court. *See Life Inv'rs Ins. Co. of Am. v. Fed. City Region, Inc.*, 687 F.3d 1117, 1121-22 (8th Cir. 2012) ("To be considered on summary judgment, documents must be authenticated by ... an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence ....") (quoting *Stuart v.*

*Gen. Motors Corp.*, 217 F.3d 621, 635-36 n. 20 (8th Cir. 2000)); *see also* NECivR 7.1(a)(2)(C) ("An affidavit must identify and authenticate any documents offered as evidence. The affidavit must be made on personal knowledge, set forth facts that would be admissible in evidence, show affirmatively that the affiant is competent to testify to the matters stated, and identify the related motion."); Fed. R. Evid. 901(a) ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is.").

LeFever generally complains that the DVDs have not been viewed by him or "forensically inspected for accuracy," but he does not object that the video evidence "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "[T]he standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could* be presented at trial in an admissible form." *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 770 (8th Cir. 2022) (quoting *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (emphasis in original)).

LeFever has not specifically requested any relief under Rule 56(d) or (e), nor has he made a proper showing by affidavit or declaration that, "for specified reasons, [h]e cannot present facts essential to justify [his] opposition" or "properly address [Defendants'] assertion of fact as required by Rule 56(c)." Fed. R. Civ. P. 56(d),(e). LeFever's lack of access to video equipment in prison was first raised as an issue by LeFever in a motion for appointment of counsel he filed on October 8, 2021 (Filing 59). The court denied LeFever's motion on October 25, 2021, but stated:

> If Plaintiff has obtained some particular material through discovery that he has not been allowed to view, he should request the court's assistance to arrange a viewing.

(Filing 60, p. 2.)

LeFever has never asked the court for such assistance. Instead, LeFever filed a motion for reconsideration of the court's denial of his request for appointment of counsel (Filing 66, Part 2); a motion for a temporary restraining order to enjoin NDCS and prison officials—all non-parties—from confiscating DVDs (Filing 74); and a second motion for reconsideration of the denial of his motion for appointment

of counsel (Filing 79). The court carefully explained its reasons for denying those requests. (See Filings 60, 71, 77, 80.)

LeFever also complains he does not have access to videos from "dash cams" or "body cams" of other officers who were involved in pursuing and apprehending him, but there is no indication that such evidence would create a genuine issue of material fact. "[A] court may defer considering a summary judgment motion or allow time for discovery '[i]f a nonmovant shows by affidavit or declaration that, for specific reasons, it cannot present facts essential to justify its opposition.'" *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 836 (8th Cir. 2015) (quoting Fed. R. Civ. P. 56(d)). A Rule 56(d) motion, however, "is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious." *Duffy v. Wolle*, 123 F.3d 1026, 1040 (8th Cir. 1997); *see also Gardner v. Howard*, 109 F.3d 427, 431 (8th Cir. 1997) ("[Rule 56 (d)] does not condone a fishing expedition."). A nonmovant seeking relief under Rule 56(d) must do more than speculate that it may discover additional facts that would overcome a motion for summary judgment and must submit an affidavit showing "what specific facts further discovery might unveil." *Stanback v. Best Diversified Prods.*, 180 F.3d 903, 911 (8th Cir. 1999). "Where a party fails to carry [its] burden under Rule [56(d) ], 'postponement of a ruling on a motion for summary judgment is unjustified.'" *Id.* (quoting *Humphreys v. Roche Biomedical Labs., Inc.*, 990 F.2d 1078, 1081 (8th Cir. 1993)).

In addition, LeFever had ample time to obtain such evidence before now. He twice attempted to subpoena such evidence in January 2022 (Filings 82, 91), but on both occasions failed to comply with the court's local rule which requires giving advance notice to other parties and attempting to resolve any objections before the subpoenas can issue.[8] See Memorandum and Order entered January 7, 2022 (Filing 83); Memorandum and Order entered February 9, 2022 (Filing 96). No further request for issuance of subpoenas was filed by LeFever. However, he did file a "motion to compel discovery" on February 18, 2022 (Filing 98), which revisited the

---

[8] *See* NECivR 45.1(a) ("No subpoenas for production or inspection may be issued for service on a nonparty without giving the adverse party notice stating the name and address of the nonparty being subpoenaed, the documents or items to be produced or inspected, the time and place for production or inspection, and the date on which the subpoena will issue.").

issue. The motion was denied for LeFever's failure to attempt to resolve Defendants' objections.[9] See Memorandum and Order entered March 8, 2022 (Filing 110).

Defendants' motions for summary judgment and supporting evidence have been on file since February 22 and 28, 2022, and LeFever has been granted numerous extensions of time to respond. His original response deadlines of March 15 and 21, 2022, were ultimately extended by almost 6 months, until August 12, 2022.[10] (See Filings 112, 118, 120, 122, 124, 126.) No further extensions of time will be granted.

## C. Filing 139

LeFever again requests appointment of counsel. Previous requests were denied by the court on October 25, 2021, December 14, 2021, and January 3, 2022. (See Filings 60, 71, 80.) The only significant change in circumstances since the last denial has been the filing of Defendants' motions for summary judgment on or before February 28, 2022, which was the deadline established in the amended progression schedule—a date one month after the close of discovery. (See Filing 72.)

LeFever protests that his lack of legal training, physical disabilities, and housing restrictions prevent him from effectively defending against the motions for summary judgment. The court, as promised, made allowances for these alleged disadvantages by liberally granting LeFever extensions of time. The facts and legal issues involved in this case are not sufficiently complex to justify the appointment of counsel at the summary judgment stage, and, based upon LeFever's pleadings and numerous other filings with the court, he is capable of representing himself in this matter, if only he would adhere to applicable rules of procedure and evidence. *See Bunch*, 863 F.3d at 1067 ("[Plaintiff's] status as a pro se litigant did not excuse her from following the local rules."); *Bennett v. Dr Pepper/Seven Up, Inc.*, 295 F.3d 805, 808 (8th Cir. 2002) ("[Plaintiff's] pro se status did not entitle him to disregard

---

[9] *See* NECivR 45.1(b) ("After receipt of the notice, the adverse party has 7 days to serve written objections to the subpoena on the noticing party…. No subpoena may be issued for documents or premises whose inspection or production is contested under this rule until the parties resolve the objections.").

[10] Although LeFever's first round of responsive filings was not received by the court until August 18, 2022, he may be entitled to the benefit of the "prison mailbox" rule.

the Federal Rules of Civil Procedure, even without affirmative notice of the application of the rules to his case." (internal quotation and citation omitted)); *Burgs v. Sissel*, 745 F.2d 526, 528 (8th Cir. 1984) ("[P]ro se litigants are not excused from failing to comply with substantive and procedural law."). Having once again considered all relevant factors, see *Davis v. Scott*, 94 F.3d 444, 447 (8th Cir. 1996), the court finds that LeFever's motion for appointment of counsel should be denied.

### D. Filing 138

Finally, LeFever requests that he be permitted to amend or replace Filings 127 through 134 (his initial filings in response to Defendants' motions for summary judgment) after he has been appointed counsel. This motion will be denied for the reasons previously stated. Defendants' motions for summary judgment will be decided based upon the filings made to date.

### V. UNDISPUTED MATERIAL FACTS

Defendants' briefs each include a separate statement of material facts which complies with Rule 56.1(a)(1). LeFever's opposing briefs (Filings 129, 130, 131) do not contain "a concise response to the moving party's statement of material facts" in the format that is mandated by NECivR 56.1(b)(1). LeFever has responded in narrative form to some of Defendants' numbered statements of fact in his opposing briefs, but his statements are not supported by his own an affidavit or declaration[11] or by any competent, admissible evidence. He has also filed a "statement of disputed factual issues" (Filing 134), which is merely a recitation of the ultimate issues to be decided in this case. The nonmoving party "must respond by submitting evidentiary

---

[11] "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The Eighth Circuit has interpreted Rule 56(c) and 28 U.S.C. § 1746 as prohibiting a court's consideration of an unsworn statement or declaration when deciding a motion for summary judgment unless it is signed, dated, and certified as true and correct under penalty of perjury. *Zubrod v. Hoch*, 907 F.3d 568, 574 (8th Cir. 2018) (citing *Banks v. Deere*, 829 F.3d 661, 667 (8th Cir. 2016)). LeFever's opposing "declaration" (Filing 132) fails to comply with Rule 56(c) and § 1746 because it is not made under penalty of perjury and there is no certification that the statements of fact are true and correct.

materials" of specific facts showing the presence of a genuine issue for trial. *Bedford*, 880 F.3d at 997 (quoting *Torgerson*, 643 F.3d at 1042). "The nonmoving party … cannot rest on mere denials or allegations. The nonmoving party must instead present enough evidence that a jury could reasonably find in his favor." *Id.* (citations omitted).

Accordingly, Defendants' statements of fact are deemed admitted.[12] They are set forth below.

## A. Deputy Castellanos[13]

1.      On June 4, 2018, Castellanos was dispatched to investigate a stranded vehicle that had been parked on the side of County Road 409 one mile north of Highway 30 since the day before. (Castellanos Aff. [Filing 102-1] p. 1, ¶ 1).[14]

2.      Castellanos arrived on scene at approximately 8:19 a.m. (Castellanos Aff. p. 1, ¶ 1).

3.      Castellanos' dash camera was on and recorded the entire encounter with LeFever. (Castellanos Aff. p. 1, ¶ 2).[15]

4.      When Castellanos arrived on scene, he parked behind the vehicle and approached on the passenger side. (Castellanos Aff. p. 1, ¶ 2).

5.      His initial contact was when LeFever rolled down the passenger window. (Castellanos Aff. p. 2, ¶ 3).

---

[12] The court has carefully examined all evidence cited and confirmed that the statements of fact have evidentiary support.

[13] See Filing 102, pp. 7-17.

[14] Record references in Castellanos' brief were placed in footnotes. The court has placed those references after their respective statements of fact. The court has also supplied the filing numbers (in brackets) for all evidence cited by Castellanos and other Defendants.

[15] This video and audio recording is contained in a DVD marked as Exhibit A to Castellanos' Affidavit. (See Filing 103.)

6.     When LeFever rolled the window down, Castellanos noticed a "Cannabis Shop" bag with a Colorado phone number on it sitting in plain sight on the front passenger seat. (Castellanos Aff. p. 2, ¶ 3).

7.     It is well known to law enforcement that cannabis stores in Colorado fill these bags with marijuana purchased by their customers. (Castellanos Aff. p. 2, ¶ 3).

8.     Marijuana is legally sold in Colorado, but it is illegal in Nebraska. (Castellanos Aff. p. 2, ¶ 3).

9.     LeFever exited his vehicle to answer Castellanos' questions. (Castellanos Aff. p. 2, ¶ 4).

10.     LeFever acted nervous like something was wrong or he knew he had a warrant. (Castellanos Aff. p. 2, ¶ 4).

11.     LeFever said he was parked on the side of the road because he was having tire trouble. (Castellanos Aff. p. 2, ¶ 4).

12.     He also said that he was driving home from Colorado to Broken Bow, Nebraska. (Castellanos Aff. p. 2, ¶ 4).

13.     Castellanos found this suspicious because County Road 409 is nowhere close to being a direct or short route to Broken Bow. (Castellanos Aff. p. 2, ¶ 4).

14.     It was also suspicious that LeFever said he was driving back from Colorado where marijuana is legally sold. (Castellanos Aff. p. 2, ¶ 4).

15.     Castellanos reasonably suspected that there were drugs in the vehicle based on LeFever's admission he was driving from Colorado, the circuitous route he drove, the cannabis bag's presence, and LeFever's nervous behavior. (Castellanos Aff. p. 2, ¶ 4).

16.     LeFever did not have identification and admitted that his license had been suspended. (Castellanos Aff. p. 2, ¶ 5).

14

17.     LeFever wrote down his information and Castellanos radioed dispatch to check if LeFever had any warrants and if his license was suspended. (Castellanos Aff. p. 2, ¶ 5).

18.     Castellanos radioed for backup from Gothenburg police because he intended to arrest LeFever. (Castellanos Aff. p. 2, ¶ 5).

19.     Also, because LeFever was significantly bigger than Castellanos, he wanted backup to assist with the arrest. (Castellanos Aff. p. 2, ¶ 5).

20.     While Castellanos was sitting in his cruiser, he noticed LeFever enter the driver side of his vehicle, retrieve something from the front passenger seat and then exit his vehicle and sit on a spare tire outside the vehicle. (Castellanos Aff. p. 2, ¶ 5).

21.     Dispatch confirmed that LeFever's license was suspended, but also advised that he had a drug offense history, he was a multi-state felony offender, and that he had used a weapon to commit a felony in the past. (Castellanos Aff. p. 3, ¶ 6).

22.     Castellanos went back outside and told LeFever that he confirmed his license was suspended and said to LeFever that he had obviously driven the vehicle to this spot. (Castellanos Aff. p. 3, ¶ 6).

23.     LeFever admitted he had driven to that spot on a suspended license. (Castellanos Aff. p. 3, ¶ 6).

24.     Castellanos told LeFever he did not intend to arrest him for driving under suspension because he needed to stall LeFever and control the situation until the Gothenburg officer could arrive to assist with the arrest. (Castellanos Aff. p. 3, ¶ 6).

25.     Also, Castellanos stalled LeFever by asking him to make some calls to find someone to pick up the car. (Castellanos Aff. p. 3, ¶ 6).

26.     At some point during this exchange [Officer Jill] McCandless from the Gothenburg Police Department arrived. (Castellanos Aff. p. 3, ¶ 7).

27.     As LeFever was making calls, Castellanos went back to the passenger window and saw that LeFever had removed the cannabis bag from the front passenger seat. (Castellanos Aff. p. 3, ¶ 7).

28.     Castellanos returned and asked LeFever if there were any drugs in his vehicle. (Castellanos Aff. p. 3, ¶ 7).

29.     LeFever denied there were any drugs. (Castellanos Aff. p. 3, ¶ 7).

30.     Castellanos then asked LeFever what he did with the Cannabis bag, and LeFever pointed to the spare tire he had been sitting on. (Castellanos Aff. p. 3, ¶ 7).

31.     It looked to Castellanos like LeFever was trying to conceal the bag under the tire. (Castellanos Aff. p. 3, ¶ 7).

32.     LeFever retrieved the bag and handed it to Castellanos. (Castellanos Aff. p. 3, ¶ 7).

33.     Castellanos commented to LeFever that the bag was a "marijuana bag," and LeFever said "yeah," admitting that it was a marijuana bag. (Castellanos Aff. p. 3, ¶ 7).

34.     Castellanos determined he had probable cause to arrest LeFever because of his license suspension, which LeFever admitted, and that dispatch confirmed. (Castellanos Aff. p. 3, ¶ 8).

35.     Also, Castellanos had a reasonable suspicion to believe that LeFever possessed illegal drugs and to detain LeFever and conduct an investigation because:

- The cannabis bag's presence on the vehicle passenger seat;
- LeFever removed the bag and tried to conceal it under the spare tire;
- LeFever's drug history reported by dispatch;
- LeFever's admission that he was driving home from Colorado where marijuana is sold;
- LeFever's comment that he was driving to Broken Bow but on a road that did not directly lead to Broken Bow, which indicated he was trying to avoid detection; and
- LeFever's nervous behavior when Castellanos was asking him questions.

(Castellanos Aff. pp. 3-4, ¶ 8).

36.    Castellanos told LeFever that he suspected there was something in the car and after a brief discussion, told LeFever he was going to search the vehicle. (Castellanos Aff. p. 4, ¶ 9).

37.    But LeFever had locked the doors and refused to unlock them despite claiming there was nothing illegal in the vehicle. (Castellanos Aff. p. 4, ¶ 9).

38.    Castellanos determined he had probable cause to search LeFever's vehicle. (Castellanos Aff. p. 3-4, ¶¶ 4, 8, 9 & 10); (Court Order CR20-40 [Filing 102-8], pp. 6-7).

39.    In fact, the Court in LeFever's criminal case overruled LeFever's motion to suppress evidence that was obtained from his vehicle and in finding that probable cause existed to search the vehicle said:

> The probable cause Castellanos had when he asked LeFever for permission to search the car was the presence of the marijuana bag and the fact LeFever had, by his own admission, driven the car without a valid operator's license. Additionally, Castellanos observed LeFever's unwillingness to cooperate with Castellanos; Castellanos knew LeFever had been in the car overnight, despite his claims of having tried to contact someone to help him; the fact LeFever removed a bag clearly marked as having contained marijuana from inside the car placed it outside and locked the doors of the car; and LeFever stated he had nothing in the car but refused the search.

(Court Order CR20-40, pp. 6-7).[16]

40.    Castellanos and LeFever had another discussion about the vehicle's contents and then Castellanos asked LeFever if he had any weapons on him, which LeFever denied. (Castellanos Aff. p. 4, ¶ 10).

---

[16] Castellanos does not argue that the state district court's probable cause finding has any preclusive effect here.

41.     LeFever then consented to a pat down and Castellanos patted him down for weapons, but LeFever was agitated and became argumentative during the pat down. (Castellanos Aff. p. 4, ¶ 10).

42.     After patting him down, Castellanos told LeFever to put his hands behind his back. (Castellanos Aff. p. 4, ¶ 11).

43.     LeFever refused and argued that no probable cause existed to arrest him. (Castellanos Aff. p. 4, ¶ 11).

44.     At this time, McCandless (now deceased) told LeFever "you are being detained." (Castellanos Aff. p. 4, ¶ 11).

45.     Despite Castellanos' attempt to handcuff LeFever and McCandless saying LeFever was being detained, LeFever tried walking away. (Castellanos Aff. p. 4, ¶ 11).

46.     McCandless and Castellanos followed LeFever. (Castellanos Aff. p. 4, ¶ 12).

47.     Castellanos drew his taser and ordered LeFever to put his hands behind his back and to stop. (Castellanos Aff. p. 4, ¶ 12).

48.     LeFever stopped, turned around and asked if he was under arrest. (Castellanos Aff. p. 5, ¶ 12).

49.     Castellanos ordered LeFever to get on the ground, but LeFever refused. (Castellanos Aff. p. 5, ¶ 12).

50.     LeFever asked two more times if he was under arrest, and after the third time Castellanos told him "you are under arrest." (Castellanos Aff. p. 5, ¶ 12).

51.     Castellanos then ordered LeFever to turn around and get on the ground several more times. (Castellanos Aff. p. 5, ¶ 12).

52.     Castellanos also warned LeFever that he would be tased if he did not get on the ground. (Castellanos Aff. p. 5, ¶ 12).

53.     LeFever knelt on the ground and McCandless attempted to handcuff him. (Castellanos Aff. p. 5, ¶ 13).

54.     McCandless placed one cuff on LeFever's right wrist and attempted to cuff the left wrist. (Castellanos Aff. p. 5, ¶ 13).

55.     LeFever resisted and refused to put his left hand behind his back. (Castellanos Aff. p. 5, ¶ 13).

56.     Castellanos told LeFever he was under arrest for DUS [driving under suspension]. (Castellanos Aff. p. 5, ¶ 13).

57.     When LeFever heard this, he spun around in an aggressive manner, got on one knee, and continued arguing with Castellanos. (Castellanos Aff. p. 5, ¶ 13).

58.     Castellanos moved to face LeFever and ordered him to put his hands behind his back. (Castellanos Aff. p. 5, ¶ 13).

59.     LeFever did not put his hands behind his back and instead lunged at Castellanos and tried grabbing the taser. (Castellanos Aff. p. 5, ¶ 14).

60.     Castellanos fired his taser and shocked LeFever twice. (Castellanos Aff. p. 5, ¶ 14).

61.     The taser was ineffective and LeFever grabbed the taser wires, rolled around on the ground and dislodged the taser prongs. (Castellanos Aff. p. 5, ¶ 14).

62.     LeFever stood up and fled arrest. (Castellanos Aff. p. 5, ¶ 14).

63.     Then LeFever tried to steal McCandless' cruiser, but the door was locked. (Castellanos Aff. p. 5, ¶ 14).

64.     LeFever fled on foot to a nearby residence. (Castellanos Aff. p. 5, ¶ 14).

65.     LeFever tried to steal a pickup truck parked at the residence but could not find the keys. (Castellanos Aff. p. 5, ¶ 15).

66.     LeFever then broke into the residence, presumably looking for keys. (Castellanos Aff. p. 5, ¶ 15).

67.     When LeFever exited the residence, he assaulted the homeowner on the wooden deck and struggled with him for something, either a weapon or keys. (Castellanos Aff. p. 5, ¶ 15).

19

68.    McCandless was at the deck with her gun drawn and Castellanos approached with his gun drawn. (Castellanos Aff. p. 5, ¶ 15).

69.    LeFever then ran off the deck and stole the homeowner's "gator" [all-terrain vehicle]. (Castellanos Aff. p. 5, ¶ 16).

70.    LeFever drove down the driveway toward a man and a young kid sitting in an SUV at the end of the driveway. (Castellanos Aff. p. 5, ¶ 16).

71.    Castellanos chased LeFever on foot and ordered him to stop. (Castellanos Aff. p. 6, ¶ 16).

72.    LeFever did not stop. (Castellanos Aff. p. 6, ¶ 16).

73.    So, Castellanos shot one-time at the gator's rear tire trying to disable it. (Castellanos Aff. p. 6, ¶ 16).

74.    The bullet missed the tire but hit the hub cap and knocked it off. (Castellanos Aff. p. 6, ¶ 16).

75.    Castellanos did not fire his weapon at LeFever. (Castellanos Aff. pp. 6-7, ¶¶ 17 & 21).

76.    Castellanos did not intend to harm LeFever. (Castellanos Aff. pp. 6-7, ¶¶ 17 & 21).

77.    Castellanos attempted to disable the gator because he feared LeFever would assault the man and young kid in the SUV at the end of the driveway and steal their vehicle because LeFever had:

- Attempted to assault Castellanos;
- Attempted to steal two other vehicles;
- Assaulted the homeowner just seconds before; and
- Successfully stole the gator.

(Castellanos Aff. pp. 6-7, ¶¶ 17 & 21).

78.    LeFever showed he would do anything to escape, and Castellanos believed he would also assault the man and young kid when he shot at the gator's tire (luckily LeFever did not). (Castellanos Aff. pp. 6-7, ¶¶ 17 & 21).

79.     Next, Castellanos pursued LeFever in his cruiser and called out to dispatch "shots fired," referring to his attempt to shoot the gator's rear tire. (Castellanos Aff. p. 6, ¶ 18).

80.     This is a standard radio call no matter if the shot is fired by law enforcement or a suspect. (Castellanos Aff. p. 6, ¶ 18).

81.     Castellanos did not call out over the radio that LeFever "has weapons." (Castellanos Aff. p. 6, ¶ 18).

82.     About thirteen minutes after Castellanos called out "shots fired," a call came over the radio asking, "what was the subject armed with?" (Castellanos Aff. p. 6, ¶ 19).

83.     Castellanos responded, "nothing when we patted him down." (Castellanos Aff. p. 6, ¶ 19).

84.     Castellanos ended his pursuit at approximately 9:01 a.m. after LeFever abandoned the gator, stole a pickup truck, drove through a field, and crashed through a fence and onto the interstate. (Castellanos Aff. p. 6, ¶ 20).

85.     The pursuit ended more than an hour after Castellanos called out "shots fired" on the radio. (Castellanos Aff. p. 6, ¶ 19); (R. Kramer Aff. ¶¶ 4, 27, 34); (J. Kramer Aff. ¶¶ 4, 28, 34); (Schmidt Aff. ¶¶ 18, 26).

86.     Castellanos complied with the Sheriff Department's use of force policy. (Moody Aff. [Filing 102-2] p. 2, ¶¶ 10-14 & Ex. A [to Moody Aff., Filing 102-3]).

87-89. Not deemed admitted.[17]

---

[17] Paragraphs 87, 88, and 89 of Defendant Castellanos' statement of facts are not deemed admitted because they contain only conclusions of law (i.e., "Probable cause existed to arrest LeFever independent of what Castellanos said on the radio. Probable cause existed to 'seize' LeFever and end the high-speed chase to protect law enforcement and the public. Trevino, R. Kramer, J. Kramer, and Schmidt used reasonable force to end the dangerous chase."). *See* NECivR 56.1(a) ("The statement must not contain legal conclusions."); *Peterson v. City of Plymouth*, 60 F.3d 469, 475 (8th Cir. 1995) ("Both probable cause and qualified immunity are ultimately questions of law.").

## B. Trooper Trevino[18]

1.    On June 4, 2018, Trevino was in uniform, displaying the badge of office, and driving a marked Nebraska State Patrol ("NSP") vehicle. (Trevino Aff. [Filing 105-1] p. 1, ¶ 1)

2.    He was working a normal shift, working at the eastbound North Platte, Nebraska permanent scale beginning at 8:10 a.m. (Trevino Aff. p. 1, ¶ 2)

3.    Trevino overheard radio communications while at the scale, stating that there was an active pursuit involving the Dawson County Sheriff's Office ("DCSO"). (Trevino Aff. p. 1, ¶ 3)

4.    DSCO requested assistance from the State Patrol. (Trevino Aff. p. 1, ¶ 3)

5.    NSP initially dispatched Trooper Robert Golden ("Golden") to the location of the pursuit near Cozad, Nebraska. (Trevino Aff. p. 2, ¶ 4)

6.    NSP communication advised that the suspect had shot at a Sheriff's Deputy. (Trevino Aff. p. 2, ¶ 5).

7.    The suspect was later identified as LeFever. (Doc. 102-1 [Castellanos Aff.], p. 2, ¶ 3)

8.    The deputy was identified as Defendant DSCO Deputy Ivan Castellanos ("Castellanos"). (Doc. 102-1, p. 1, ¶ 1)

9.    This communication was repeated several times via radio during the pursuit. (Trevino Aff. p. 2, ¶ 5)

10.    Additional NSP troopers, including Sergeant Shanon Koubek ("Koubek") and Trooper Nicholas Jones ("Jones"), joined the pursuit as it got closer to Gothenburg, Nebraska. (Trevino Aff. p. 2, ¶ 6)

---

[18] See Filing 105, pp. 2-8.

11.    Once the pursuit was near Gothenburg, NSP Troopers Nathan Veal ("Veal") and Trevino began heading east on Interstate 80. (Trevino Aff. p. 2, ¶ 7)

12.    Trevino drove to the off-ramp at the Maxwell Interchange in an attempt to stop the LeFever [vehicle] from exiting the interstate. (Trevino Aff. p. 2, ¶ 7; Ex. A [to Trevino Aff., Filing 106])[19]

13.    At this time, NSP communication provided a description of LeFever's vehicle as being a tan-colored Chevrolet Silverado. (Trevino Aff. p. 2, ¶ 8)

14.    A vehicle matching this description passed by Trevino travelling westbound. (Trevino Aff. p. 2, ¶ 9)

15.    There were no law enforcement vehicles in pursuit and he began following the truck with his emergency lights activated. (Trevino Aff. p. 2, ¶ 9)

16.    Trevino was unable to keep up with the vehicle as speeds increased to over 96 mph. (Trevino Aff. p. 2, ¶ 9; Ex. A)

17.    Trevino let NSP Troopers Veal and Carolyn O'Brien ("O'Brien") become the primary and secondary pursuit vehicle as he continued following with [his] lights activated. (Trevino Aff. p. 2, ¶ 10)

18.    During this time, Trevino observed LeFever's vehicle suddenly turn to the right off Interstate 80, cross through the right-of-way fence and begin travelling westbound on West Island Road, an unpaved road that parallels Interstate 80 near mile marker 186. (Trevino Aff. p. 2, ¶ 11; Ex. A)

19.    NSP Troopers Veal and Trevino left the interstate and crossed through the fence to continue the pursuit. (Trevino Aff. p. 3, ¶ 12)

20.    LeFever left the unpaved road and started driving westbound through open farm fields at a high rate of speed approaching 70 mph. (Trevino Aff. p. 3, ¶ 12; Ex. A)

---

[19] Exhibit A to Trevino's Affidavit is a DVD containing video and audio from his dashboard and body cameras. See Trevino Aff. p. 1, ¶ 1.

21.     After LeFever's vehicle came to a dead-end tree line, LeFever turned and started travelling southeast along another tree line through open fields. (Trevino Aff. p. 3, ¶ 13; Ex. A)

22.     During this time, several other marked law enforcement vehicles passed Trevino with their lights activated. (Trevino Aff. p. 3, ¶ 13; Ex. A)

23.     LeFever never slowed down during this pursuit and a few times became airborne in the open fields going 70 mph. (Trevino Aff. p. 3, ¶ 13; Ex. A)

24.     LeFever then crossed Interstate 80 at an unpaved overpass called Novacek Road. (Trevino Aff. p. 3, ¶ 14; Ex. A)

25.     As Trevino was the primary pursuit vehicle at this time, he activated his sirens. (Trevino Aff. p. 3, ¶ 14; Ex. A)

26.     The road became a dead-end but LeFever's vehicle drove through a private property fence and circled back onto Novacek Road. (Trevino Aff. p. 3, ¶ 14; Ex. A)

27.     LeFever's vehicle passed numerous marked law enforcement vehicles with their emergency lights activated and then drove through another right-of-way fence, crossing the eastbound lanes of Interstate 80 while travelling in the wrong direction by going westbound. (Trevino Aff. p. 3, ¶ 15; Ex. A)

28.     LeFever passed several vehicles on the Interstate at this time that had to immediately slow down to avoid collisions. (Trevino Aff. p. 3, ¶ 15)

29.     LeFever then entered the westbound lanes of Interstate 80 going westbound. (Trevino Aff. p. 3, ¶ 15)

30.     NSP Troopers Veal and Trevino lost contact at this time with LeFever's vehicle as they tried to get back on Interstate 80 with the assistance of local landowners. (Trevino Aff. p. 3, ¶ 16)

31.     Trevino met with Koubek and advised that he would continue westbound from North Platte to continue the search for LeFever's vehicle. (Trevino Aff. p. 4, ¶ 17)

32.     Trevino met with several construction workers in that area but they had not seen that vehicle. (Trevino Aff. p. 4, ¶ 17)

33.     Trevino continued westbound on Interstate 80 and heard radio communications from Nebraska State Fire Marshal Michael Hoeft ("Hoeft"), who advised that he had located LeFever's vehicle on Highway 30 near Splinter Road. (Trevino Aff. p. 4, ¶ 18; Ex. A)

34.     Hoeft advised that LeFever's vehicle was travelling in excess of 100 mph. (Trevino Aff. p. 4, ¶ 18)

35.     Trevino exited Interstate 80 and headed in the direction of Hershey, Nebraska. (Trevino Aff. p. 4, ¶ 19; Ex. A)

36.     Trevino heard over the radio communications from Lieutenant Kirk Hansel ("Hansel") that a Tactical Vehicle Intervention ("TVI") had been approved. (Trevino Aff. p. 4, ¶ 19)

37.     Trevino continued the pursuit of LeFever's vehicle with Koubek along North Parkway Road and stopped on Suburban Road. (Trevino Aff. p. 4, ¶ 20; Ex. A)

38.     At this time, Trevino observed LeFever's vehicle travelling east along the tree line. (Trevino Aff. p. 4, ¶ 20; Ex. A)

39.     A marked [Lincoln County Sheriff ("LCS")] vehicle drove towards LeFever's vehicle while another [LCS] vehicle drove north on North Parkway Road. (Trevino Aff. p. 4, ¶ 20; Ex. A)

40.     Trevino took a position at the intersection of North Parkway and Suburban Roads facing east. (Trevino Aff. p. 4, ¶ 20; Ex. A)

41.     At the intersection, Trevino observed LeFever's vehicle driving southeast across a farm field heading in the general direction of his vehicle. (Trevino Aff. p. 4, ¶ 21; Ex. A)

42.     At this time, Trevino also noticed a [LCS] vehicle a short distance away to his left. (Trevino Aff. p. 4, ¶ 21; Ex. A)

43.    Throughout this pursuit, LeFever had presented a grave risk to the public and law enforcement due to his high rate of speed as well as the concern that LeFever had a weapon in the vehicle. (Trevino Aff. p. 4, ¶ 22)

44.    Due to these concerns, Trevino made the decision to try to disable the vehicle and apprehend LeFever. (Trevino Aff. p. 5, ¶ 23)

45.    Trevino was able to impact LeFever's vehicle on its passenger side as he could see there were no passengers in LeFever's vehicle. (Trevino Aff. p. 5, ¶ 23; Ex. A)

46.    Trevino could observe LeFever to be a White male with a goatee and what appeared to be a ponytail. (Trevino Aff. p. 5, ¶ 23)

47.    Trevino impacted LeFever's vehicle approximately at the front passenger door. (Trevino Aff. p. 5, ¶ 24; Ex. A)

48.    This resulted in LeFever's vehicle becoming lodged against Trevino's vehicle for a few seconds and he attempted to drive forward but he could not. (Trevino Aff. p. 5, ¶ 24; Ex. A)

49.    LeFever then began driving backwards and to the right in the direction of where Trevino knew LCS deputies were located. (Trevino Aff. p. 5, ¶ 25; Ex. A)

50.    Trevino exited his vehicle and observed LeFever's vehicle stop momentarily and then drive forward to the north and east. (Trevino Aff. p. 5, ¶ 26; Ex. A)

51.    At this time, Trevino was concerned LeFever had a firearm with him, and recalled LeFever had previously fired his weapon at law enforcement and may attempt to do so again. (Trevino Aff. p. 5, ¶ 26)

52.    Trevino was also concerned for the safety of the general public due to LeFever's erratic and deadly driving behavior. (Trevino Aff. p. 5, ¶ 26)

53.    Based on these concerns, Trevino shot at LeFever with his law-enforcement issued handgun. (Trevino Aff. p. 5, ¶ 27; Ex. A)

54.     LeFever's vehicle then began to slowly travel northbound and other law-enforcement to the northwest of my position began to engage the suspect with their firearms as well. (Trevino Aff. p. 5, ¶ 28; Ex. A)

55.     The suspect vehicle continued driving slowly north until it came to a rest. (Trevino Aff. p. 5, ¶ 28; Ex. A)

56.     Throughout his involvement with the pursuit of the suspect vehicle, Trevino observed LeFever's drive in a dangerous and menacing way, putting lives in danger. (Trevino Aff. p. 6, ¶ 29)

57.     Trevino observed LeFever after he attempted to use his vehicle to stop this deadly behavior, but the collision did not hinder LeFever's erratic and lethal actions in any way. (Trevino Aff. p. 6, ¶ 30)

58.     Trevino made the decision to stop the suspect by use of his firearm to prevent any lives from being harmed by LeFever or LeFever's vehicle. (Trevino Aff. p. 6, ¶ 30)

### C. Sheriff Kramer, Chief Dep. Kramer, and Dep. Schmidt[20]

1.     Defendants are employed by the Lincoln County Sheriff's Department. (Sheriff Kramer Aff. [Filing 109-1] ¶ 2; Chief Dep. Kramer Aff. [Filing 109-1] ¶ 2; Dep. Schmidt Aff. [Filing 109-3] ¶ 2).

2.     On the morning of June 4, 2018, while on duty, Defendants were called to assist in a vehicular pursuit of Plaintiff, Luke LeFever, in Lincoln County, Nebraska. (Sheriff Kramer Aff. ¶ 4; Chief Dep. Kramer Aff. ¶¶ 3-4; Dep. Schmidt Aff. ¶¶ 4-5).

3.     Defendants joined the pursuit of Plaintiff alongside several other law enforcement agencies. (Sheriff Kramer Aff. ¶ 14; Chief Dep. Kramer Aff. ¶ 14; Dep. Schmidt Aff. ¶ 11).

4.     Defendants were advised on multiple occasions that shots had previously been fired, and at times were advised that Plaintiff was the shooter. At no

---

[20] See Filing 109, pp. 2-5.

time during the pursuit were Defendants advised that Plaintiff did not fire shots. Throughout the pursuit, Defendants believed Plaintiff was armed. (Sheriff Kramer Aff. ¶¶ 5, 7, 9, 13; Chief Dep. Kramer Aff. ¶¶ 5-6, 8, 12; Dep. Schmidt Aff. ¶¶ 5, 7, 12, 13).

5.    Plaintiff drove recklessly in speeds in of excess of 100 mph, exited roads into pastures and farmland, became airborne due to the terrain, drove through multiple fences, and executed double backs and other erratic maneuvers on county roads, highways, and interstates. (Sheriff Kramer Aff. ¶¶ 13, 35; Chief Dep. Kramer Aff. ¶¶ 12, 35; Dep. Schmidt Aff. ¶¶ 10-11).

6.    Plaintiff drove into oncoming traffic. Civilian vehicles on the highways and interstates were slowing and stopping to avoid colliding with Plaintiff's vehicle. (Sheriff Kramer Aff. ¶ 15; Chief Dep. Kramer Aff. ¶ 15; Dep. Schmidt Aff. ¶ 14).

7.    Plaintiff had no regard for pursuing officers, civilian drivers, and potential pedestrians. (Sheriff Kramer Aff. ¶ 16; Chief Dep. Kramer Aff. ¶ 15; Dep. Schmidt Aff. ¶ 14).

8.    Defendants attempted to anticipate where Plaintiff was heading, and cleared the road of pedestrians. (Sheriff Kramer Aff. ¶¶ 19-20; Chief Dep. Kramer Aff. ¶¶ 18-19; Dep. Schmidt Aff. ¶ 15).

9.    Plaintiff evaded spike strips thrown out by law enforcement on multiple occasions, and at one point came dangerously close to striking a police officer on foot. (Sheriff Kramer Aff. ¶ 11; Chief Dep. Kramer Aff. ¶¶ 13, 21; Dep. Schmidt Aff. ¶ 14).

10.   Defendants pursued Plaintiff for approximately an hour before intercepting Plaintiff in a field near the intersection of North Parkway Road and West Suburban Road, north of the Village of Hershey, Nebraska, approximately 150 yards from a residential farm home (hereafter, the "field"). (Sheriff Kramer Aff. ¶¶ 4, 24, 28; Chief Dep. Kramer Aff. ¶¶ 4, 22, 27; Dep. Schmidt Aff. ¶ 5, 15, 18).

11.   Plaintiff attempted to exit the field to regain access to a county road, colliding with a patrol vehicle from another law enforcement agency. Two of the three Defendants [i.e., the deputies] believed Plaintiff was ramming vehicles in an

attempt to escape. (Sheriff Kramer Aff. ¶¶ 25-26; Chief Dep. Kramer Aff. ¶ 23; Dep. Schmidt Aff. ¶ 17).

12.    Plaintiff reversed at a high rate of speed toward Sheriff Jerome Kramer standing outside his patrol vehicle before stopping abruptly within 10-15 feet of Sheriff Jerome Kramer. (Sheriff Kramer Aff. ¶ 26; Chief Dep. Kramer Aff. ¶¶ 24-25; Dep. Schmidt Aff. ¶ 20).

13.    Defendants were unable to warn the Plaintiff of the potential use of deadly force. (Sheriff Kramer Aff. ¶ 27; Chief Dep. Kramer Aff. ¶ 26; Dep. Schmidt Aff. ¶ 19).

14.    As Plaintiff quickly changed course forward in a northerly direction, Defendant Chief Deputy Roland Kramer fired upon the tires of Plaintiff's tires at approximately 9:54 A.M. (Chief Dep. Kramer Aff. ¶ 27)

15.    At that time simultaneous gunfire was heard by Defendants, and the windows of Plaintiff's vehicle began breaking. (Sheriff Kramer Aff. ¶ 28; Chief Dep. Kramer Aff. ¶ 26; Dep. Schmidt Aff. ¶ 19).

16.    Defendants believed Plaintiff was firing upon them. Fearing for their lives, the lives of other officers, and the lives of possible occupants of the nearby home, Defendants began firing into the vehicle. (Sheriff Kramer Aff. ¶ 28; Chief Dep. Kramer Aff. ¶ 27; Dep. Schmidt Aff. ¶ 21).

17.    Believing they were in a gunfight, Defendants used active shooter tactics from their training to provide safety to their fellow officers. (Sheriff Kramer Aff. ¶¶ 28-29; Chief Dep. Kramer Aff. ¶¶ 27-30; Dep. Schmidt Aff. ¶¶ 21-23).

18.    Plaintiff's vehicle proceeded forward in a northerly direction for approximately 50-75 yards before coming to rest in the middle of the field. (Sheriff Kramer Aff. ¶ 20; Chief Dep. Kramer Aff. ¶¶ 25, 31)

19.    As Defendant Deputy Brett Schmidt observed Plaintiff hunched and still moving, as if reaching for a weapon, and Defendant Deputy Brett Schmidt fired additional shots into Plaintiff's driver side door. (Sheriff Kramer Aff. ¶ 31; Dep. Schmidt Aff. ¶ 22).

20.     After waiting approximately five seconds, and confirming no return gunfire from Plaintiff, Defendants approached the Plaintiff's vehicle. (Sheriff Kramer Aff. ¶ 32; Chief Dep. Kramer Aff. ¶ 32; Dep. Schmidt Aff. ¶ 24).

21.     Defendants handcuffed the Plaintiff. Plaintiff was pulled from the vehicle and law enforcement began rendering first aid for gunshot wounds to his leg. (Sheriff Kramer Aff. ¶¶ 33-34; Chief Dep. Kramer Aff. ¶¶ 33-34; Dep. Schmidt Aff. ¶¶ 25-26).

22.     Sheriff Jerome Kramer approved of his actions and the actions of Chief Deputy Roland Kramer, and Deputy Brett Schmidt, judging the same to be necessary to end threat created by Plaintiff, and in accordance with Lincoln County Sheriff's Department policy and custom. (Sheriff Kramer Aff. ¶ 36).

23.     In the days following these events, Defendants were advised that no firearms were found in Plaintiff's vehicle and he had not previously fired at officers that day. Also in the days following, Chief Deputy Roland Kramer and Deputy Brett Schmidt were advised that Plaintiff was rammed by a Nebraska State Patrol immediately before the shooting. (Sheriff Kramer Aff. ¶ 37; Chief Dep. Kramer Aff. ¶ 37; Dep. Schmidt Aff. ¶ 28).

## VI. QUALIFIED IMMUNITY

Qualified immunity shields officials from civil liability in a 42 U.S.C. §1983 action when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Morgan v. Robinson*, 920 F.3d 521 (8th Cir. 2019) (quoting *Pierson v. California*, 555 U.S. 223, 231 (2009)). Qualified immunity involves a two-step analysis: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Id.* at 523 (quoting *Nord v. Walsh Cty.*, 757 F.3d 734, 738 (8th Cir. 2014)). Unless both of these questions are answered affirmatively, a defendant is entitled to qualified immunity. Moreover, courts are permitted to exercise their sound discretion in determining which of the two prongs should be addressed first. *Id.* (quoting *Nord*, 757 F.3d at 738-39).

"A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"

*Id.* (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). The clearly established right should not be defined at a high level of generality, but instead must be particularized to the facts of the case. *Id.* There does not need to be a case directly on point, but existing precedent "must have placed the statutory or constitutional question beyond debate." *Id.* at 524 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Qualified immunity gives government officials "breathing room" to make reasonable but mistaken judgments, and protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013) (per curiam)).

"Qualified immunity is an affirmative defense for which the defendant carries the burden of proof. The plaintiff, however, must demonstrate that the law is clearly established." *Sparr v. Ward*, 306 F.3d 589, 593 (8th Cir. 2002); *see Creighton v. Anderson*, 922 F.2d 443, 447 (8th Cir. 1990) ("Once the plaintiff has demonstrated that the law governing the plaintiffs' rights was clearly established at the time of the defendant's acts, the defendant has the burden of proof with respect to all other elements of the qualified immunity defense."). "[Q]ualified immunity is lost when plaintiffs point either to 'cases of controlling authority in their jurisdiction at the time of the incident' or to 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *al-Kidd*, 563 U.S. at 746 (quoting *Wilson v. Layne,* 526 U.S. 603, 617 (1999)). "These standards ensure the officer has 'fair and clear warning' of what the Constitution requires." *Id.* (quoting *United States v. Lanier,* 520 U.S. 259, 271 (1997)).

## VII. ANALYSIS

In the discussion which follows, the court will analyze the claims against Dawson County Deputy Sheriff Castellanos, Nebraska State Trooper Trevino, and the Lincoln County Sheriff's Office Defendants. The court finds as to all individual-capacity claims that there was no constitutional violation, or, if there was, that there was no violation of a clearly established right. The court also finds there is not sufficient evidence to support the official-capacity claim against Sheriff Kramer.

### A. Deputy Castellanos

The events on June 4, 2018, began with a consensual encounter between LeFever and Deputy Castellanos, which led to Castellanos determining he had

probable cause to search LeFever's vehicle for drugs and to arrest LeFever for driving under suspension. The encounter became nonconsensual when Castellanos announced he was going search the vehicle and, after frisking LeFever for weapons, ordered LeFever to put his hands behind his back. LeFever argues he had the right to walk away because Castellanos had previously told him he would not be arrested for driving under suspension, and even said he was not under arrest just before patting him down. This argument ignores several pertinent facts. First, when LeFever refused to put his hands behind his back, Officer McCandless told him he was being detained while his car was searched.[21] Second, when LeFever began walking away after being patted down for weapons, Castellanos drew his taser and commanded LeFever to stop. And, third, after LeFever stopped and turned, he asked several times if he was under arrest and was expressly told by Castellanos that he now was under arrest for driving under suspension and that he needed to turn around, get on his knees, and put his hands behind his back or he would be tased.

The court finds Castellanos had at least probable cause to arrest LeFever for driving under suspension.[22] But even if probable cause were lacking, LeFever was

---

[21] "Officers may use handcuffs during an investigative stop if they have 'some reasonable belief that the suspect is armed and dangerous or that the restraints are necessary for some other legitimate purpose[.]'" *United States v. Halverson-Weese*, 30 F.4th 760, 765 (8th Cir. 2022) (quoting *Pollreis v. Marzolf*, 9 F.4th 737, 745 (8th Cir. 2021)); *Irvin v. Richardson*, 20 F.4th 1199, 1206 (8th Cir. 2021) )"[P]olice officers may reasonably handcuff a suspect in the course of a *Terry* stop to protect officer safety and maintain the status quo."). Whether it was reasonable to attempt to handcuff LeFever before placing him under arrest—or whether this amounted to a de facto arrest— is not directly at issue here. *See, generally*, *United States v. Johnson*, 31 F.4th 618, 623 (8th Cir. 2022) (discussing factors to consider in determining whether a *Terry* stop has become an arrest).

[22] Under Neb. Rev. Stat. § 60-4,108, driving under suspension is classified as a misdemeanor. Neb. Rev. Stat. § 29-404.02(2) authorizes a police officer to make a warrantless arrest when there is probable cause to believe that a misdemeanor is being committed in the presence of the officer, although. Neb. Rev. Stat. § 29-422 permits issuance of a citation in lieu of arrest. *Compare with* Neb. Rev. Stat. § 29-435 (requiring citation in lieu of arrest for traffic infractions unless some exception applies to permit arrest). But Fourth Amendment analysis does not require "reference to an arrest's legality under state law." *United States v. Burtton*, 599 F.3d 823, 828 (8th Cir. 2010) (quoting *United States v. Bell*, 54 F.3d 502, 504 (8th Cir.

not free to ignore Castellanos' commands. In *United States v. Sledge*, 460 F.3d 963 (8th Cir. 2006), the Eighth Circuit held that a defendant who ran away from a police officer who was trying to detain him "forfeited any Fourth Amendment protection by resisting and running away from the officers, thus creating probable cause to arrest [the defendant] for obstructing a peace officer, in violation of Neb . Rev. Stat. § 28-906(1),[23] …." *Id.* at 966; *see In re Int. of Richter*, 415 N.W.2d 476, 478 (Neb. 1987) ("Since the physical obstacle interposed by the act of running away obstructed, impaired, or hindered the officers' efforts to preserve the peace, Richter committed an infraction of a law of this state, …."); *Storrs v. Rozeboom*, No. 8:21-CV-175, 2022 WL 9444519, at *22 (D. Neb. Oct. 14, 2022) ("[E]vidence showing that a defendant resisted handcuffing and struggled with an arresting officer will sustain a conviction under this statute.") (quoting *Sledge v. Clarke*, No. 4:09CV3090, 2010 WL 323917, at *10 (D. Neb. Jan. 19, 2010)).

Nor is there any right to use force to resist even an unlawful arrest in Nebraska. *Sanchez v. Bremer*, 894 F. Supp. 2d 1190, 1195 (D. Neb. 2012) (citing Neb. Rev. Stat. § 28-1409(2)[24]); *see State v. Wells*, 859 N.W.2d 316, 330 (Neb. 2015) ("[Section 28-1409(2)] diminishes the common-law right to resist unlawful arrest and provides that regardless of whether the arrest is legal, one may not forcibly resist an arrest."); *State v. Yeutter*, 566 N.W.2d 387, 391 (Neb. 1997) ("Because it is uncontroverted that Yeutter knew that Besmer was a police officer, Yeutter was not justified in using force on the basis that he was being arrested unlawfully.").

---

1995)). "An arrest by state officers is reasonable in the Fourth Amendment sense if it is based on probable cause." *Id.* (quoting *Bell*, 54 F.3d at 504).

[23] "A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders (a) the enforcement of the penal law or the preservation of the peace by a peace officer or judge acting under color of his or her official authority or (b) a police animal assisting a peace officer acting pursuant to the peace officer's official authority." Neb. Rev. Stat. Ann. § 28-906(1) (Westlaw 2022).

[24] "The use of such force [for self-protection] is not justifiable under this section to resist an arrest which the actor knows is being made by a peace officer, although the arrest is unlawful." Neb. Rev. Stat. Ann. § 28-1409(2) (Westlaw 2022).

This brings us to LeFever's first constitutional claim, that Castellanos' used excessive force by deploying his taser.

### 1. Taser Deployment

"The Fourth Amendment protects citizens from being seized through excessive force by law enforcement officers." *Mettler v. Whitledge*, 165 F.3d 1197, 1202 (8th Cir. 1999). An officer's use of excessive force violates the Fourth Amendment if "objectively unreasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Objective unreasonableness is "judged from the perspective of a reasonable officer on the scene," in light of "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Force may be objectively unreasonable when a plaintiff does not resist, lacks an opportunity to comply with requests before force is exercised, or does not pose an immediate safety threat. *Wilson v. Lamp*, 901 F.3d 981, 989 (8th Cir. 2018). Conversely, when a suspect repeatedly refuses to comply with officers' reasonable commands, they may reasonably use some force to secure compliance. *Id.* at 989-90.

The Eighth Circuit has recognized that an officer who points a gun at a suspect may, under certain circumstances, violate that person's right to be free from excessive force. *Pollreis*, 9 F.4th at 752 (citing *Wilson*, 901 F.3d at 989-90; *Clark v. Clark*, 926 F.3d 972, 979 (8th Cir. 2019)). The Eighth Circuit has yet to hold, though, that the same rule applies to a taser.

> While the Eighth Circuit has not decided whether the act of drawing a taser and pointing it at an individual, without firing it, constitutes an excessive use of force, several district courts have addressed this very issue. In *Policky v. City of Seward, Neb.*, the district court concluded that an officer's act of drawing and pointing a taser gun did not constitute use of excessive force. 433 F. Supp. 2d 1013, 1025 (D. Neb. 2006). Similarly, in *Price v. Busbee*, 2006 WL 435670, at *3 (M.D. Ga. Feb. 21, 2006), the district court concluded that it was not an excessive use of force to threaten the use of a taser since the threat was "used in a good faith attempt to restore discipline." The district court did note that "an excessive force claim for immediate, malicious threat of electrical shock would not be indisputably meritless." *Id.* (quoting *Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001)); *see Parker v. Asher*,

701 F. Supp. 192, 195 (D. Nev. 1988) (holding that "guards cannot aim their taser guns at inmates for the malicious purpose of inflicting gratuitous fear").

*Pollreis v. Marzolf*, 446 F. Supp. 3d 444, 466 (W.D. Ark. 2020) (holding officer was entitled to qualified immunity for pointing taser at a suspect), *rev'd on other grounds*, 9 F.4th 737 (8th Cir. 2021); *see also Sanders v. City of Maryland Heights*, No. 4:14CV00238 TCM, 2015 WL 7776903, at *13 (E.D. Mo. Dec. 2, 2015) ("Nothing in the law prior to April 9, 2012 clearly established that an individual's Fourth Amendment rights were violated by an officer's display of a taser without discharge of the taser during the officer's effort to obtain compliance with the detention of the person."); *Brown v. Moore*, No. 5:13-CV-03049, 2014 WL 4410178, at *3 (W.D. Ark. Sept. 8, 2014) ("[I]t appears that this circuit has not decided whether merely pointing a taser at someone constitutes excessive force. By analogy, however, drawing and pointing a gun at a prisoner, without any indication that the officer intended or attempted to fire the gun, does not rise to the level of a constitutional violation.") (citing additional cases).

Here, of course, Deputy Castellanos did eventually fire the taser. As recorded by his dashboard camera and body microphone, the events unfolded as follows: When LeFever started walking away after he was told he was being detained, Castellanos followed him with his taser drawn and ordered LeFever to put his hands behind his back and stop. After several verbal exchanges about whether LeFever was under arrest, Castellanos said, "you are under arrest" and ordered him to get on the ground. LeFever eventually knelt on the ground with his hands behind his head after being warned that he would be tased if he did not comply. McCandless was able to get one handcuff on LeFever's right wrist, but LeFever resisted and refused to put his left hand behind his back. Then after hearing Castellanos say he was "under arrest for DUS," LeFever escalated the situation by aggressively swinging around, getting up on one knee, and arguing with Castellanos. In response, Castellanos took a position in front of LeFever with his taser still drawn. LeFever then escalated the situation further by lunging at Castellanos and grabbing at the taser. LeFever fell face down on the ground and Castellanos shot him in the back with the taser prongs. LeFever thrashed around on the ground in apparent pain but would not put his hands behind his back. LeFever complained he could not comply because of a torn rotator

35

cuff.[25] Castellanos issued another warning, and LeFever tried to grab the taser wires. Castellanos shocked him again. This time LeFever rolled on the ground several times in Castellanos' direction and managed to dislodge the taser prongs. He then stood up and fled.

Castellanos' deployment of a taser probe into LeFever's back was a "seizure" for Fourth Amendment purposes, even though it did not prevent LeFever from running away. *See Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995) ("[A] seizure is 'effected by the slightest application of physical force' despite later escape." (quoting *California v. Hodari D.,* 499 U.S. 621, 625 (1991)).[26] Under Eighth Circuit precedent, the Fourth Amendment "seizure" ended when LeFever ran away from the deputy. "[I]f someone is 'seized,' and then somehow gets away, as [LeFever] did, the first seizure 'does not continue during the 'period of fugitivity.'" *Gardner v. Buerger*, 82 F.3d 248, 254 (8th Cir. 1996) (quoting *Ludwig,* 54 F.3d at 471, in turn quoting *Hodari D.,* 499 U.S. at 625). "Thus, several distinct seizures may occur during a single course of events or encounter with the police." *Id.*

As previously explained, the court conducts a two-part inquiry to determine whether qualified immunity protects a government official from liability: "(1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Masters v. City of Independence*, 998 F.3d 827,

---

[25] The Eighth Circuit held in *McManemy v. Tierney*, 970 F.3d 1034, 1039 (8th Cir. 2020), *cert. dismissed*, 142 S. Ct. 53 (2021), that "[r]egardless of whether one or more of [the arresting officers] knew about [the plaintiff's] injury, [they] still had to subdue him, even if he had an 'innocent' reason for flailing his legs and refusing to give up one of his arms." *See Carpenter v. Gage*, 686 F.3d 644, 650 (8th Cir. 2012) (explaining that the use of a taser does not become excessive just because an arrestee has an "innocent" motive for refusing to give up his hands).

[26] The result would be different in those circuits which read *Hodari D.* and other Supreme Court precedent as "requiring intentional termination of movement or acquisition of physical control in flight situations, regardless of the force applied." *Brooks v. Gaenzle*, 614 F.3d 1213, 1223 (10th Cir. 2010) (citing cases); *see, e.g., Tabares v. City of Huntington Beach*, No. 818CV00821JLSJDE, 2019 WL 4455999, at *5 (C.D. Cal. July 30, 2019) (officer's deployment of taser, which had no apparent incapacitating effect on suspect, was not a seizure).

835 (8th Cir. 2021). To answer the first question, the court looks to "whether the amount of force used was objectively reasonable under the particular circumstances." *Id.* (quoting *Shekleton v. Eichenberger*, 677 F.3d 361, 366 (8th Cir. 2012). The court will "evaluate the reasonableness of an officer's use of force 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Brown v. City of Golden Valley*, 574 F.3d 491, 495 (8th Cir. 2009) (quoting *Graham*, 490 U.S. at 396). Looking to the totality of the circumstances, the court considers (1) "the severity of the crime at issue," (2) "the immediate threat the suspect poses to the safety of the officer or others," and (3) "whether the suspect is actively resisting or attempting to evade arrest by flight." *Shekleton*, 677 F.3d at 366 (quoting *Smith v. Kan. City, Mo. Police Dep't*, 586 F.3d 576, 581 (8th Cir. 2009))

Viewing the facts of this case in the light depicted by the uncontroverted video evidence, *see Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (finding the lower court "should have viewed the facts in the light depicted by the videotape"), the court concludes that Deputy Castellanos' deployment of the taser was objectively reasonable under the circumstances. Although LeFever was only being arrested for a misdemeanor, was not suspected of committing any other crime more serious than possession of marijuana purchased legally in Colorado, and was known to be unarmed, he was actively resisting arrest and attempting to walk away. Also, Castellanos did not fire the taser until LeFever lunged at him and attempted to grab the taser, and the second shock was administered when LeFever made another attempt. Castellanos could legitimately fear for his safety because LeFever was a much larger individual.

The court further concludes that the second prong of the qualified immunity test is satisfied. To overcome Deputy Castellanos' claim of qualified immunity, LeFever must show the violation of a constitutional right that was clearly established at the time of the violation. *See Rokusek v. Jansen*, 899 F.3d 544, 547 (8th Cir. 2018). As the plaintiff, LeFever "bears the burden of showing that the law was clearly established." *Id.*(citing *See Hess v. Ables*, 714 F.3d 1048, 1051 (8th Cir.2013)).

A right is clearly established if "every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *al-Kidd*, 563 U.S. at 741) (internal quotation marks omitted). This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *District of Columbia v. Wesby*, 138 S.Ct. 577, 589 (2018) (quoting *Malley v. Briggs,* 475 U.S.

335, 341 (1986)). To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. *Id.* The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" *Id.* at 590 (quoting *Hunter v. Bryant,* 502 U.S. 224, 228 (1991) (per curiam ); *al-Kidd*, 563 U.S. at 741-42). "It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz,* 533 U.S. 194, 202 (2001)). This requires a high "degree of specificity." *Id.* (quoting *Mullenix v. Luna,* 136 S.Ct. 305, 309 (2015) (per curiam)).

LeFever has not cited any cases—and the court is not aware of any—which would have made clear to a reasonable officer in Deputy Castellanos' position that tasing LeFever was unlawful. "Under [Eighth Circuit] precedent, it is reasonable for an officer to tase an uncuffed suspect who appears to be resisting arrest." *McManemy*, 970 F.3d at 1038 (citing *Ehlers v. City of Rapid City*, 846 F.3d 1002, 1011 (8th Cir. 2017); *Carpenter*, 686 F.3d at 650. In fact, the Eighth Circuit has held that discharging a taser in stun mode is objectively reasonable even though the suspect was resisting arrest while handcuffed. *Id.* (citing *Brossart v. Janke*, 859 F.3d 616, 626 (8th Cir. 2017)); *see also Franklin v. Franklin Cty.*, 956 F.3d 1060, 1062-63 (8th Cir. 2020) (discussing cases allowing the use of stun taser bursts on suspects who are already handcuffed). LeFever's "excessive force" claim regarding Castellanos' use of the taser therefore will be dismissed with prejudice.

### 2. Discharge of Service Weapon

It is next alleged that Deputy Castellanos shot at LeFever with his service weapon, but missed. Because LeFever was not wounded and did not submit to this display of force or to any commands that may have been issued at this time, there was no second "seizure" by Deputy Castellanos. *See Cole v. Bone*, 993 F.2d 1328, 1332 (8th Cir. 1993) ("[A] seizure occurs only when the pursued citizen is physically touched by the police or when he submits to a show of authority by the police."). Without a "seizure," there was no violation of LeFever's Fourth Amendment rights.

Although no Fourth Amendment claim can be maintained in the absence of a "seizure," a misaimed shot might give rise to a substantive due process claim under the Fourteenth Amendment. *See, e.g., James v. Chavez*, 830 F. Supp. 2d 1208, 1271 (D.N.M. 2011) ("The Court has concluded that, when Carter fired a shot at Murphy Sr., no seizure occurred. The Court has also concluded that Carter did not seize M. Murphy when he missed her with his bullet. Thus, James may proceed on a substantive due-process theory regarding Carter firing a shot at Murphy Sr. and M. Murphy as the Fourth Amendment does not apply to those situations."), *aff'd*, 511 F. App'x 742 (10th Cir. 2013).

To establish a substantive due process violation under the Fourteenth Amendment, LeFever must show that Deputy Castellanos' conduct in discharging his service weapon was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Braun v. Burke*, 983 F.3d 999, 1002 (8th Cir. 2020). Negligence is never enough. *Id.* Deliberate indifference makes sense "only when actual deliberation is practical." *Id.* (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). But, typically—and especially in "rapidly evolving, fluid, and dangerous situations"—the plaintiff must show an intent to harm. *Id.*

The evidence of record, including the dash-cam video with body-mic audio, shows that LeFever, after dislodging the taser prongs, stood up and fled arrest. He tried to steal McCandless' cruiser, but the door was locked. He then fled on foot to a nearby residence, where he tried to steal a pickup truck parked at the residence but could not find the keys. He then broke into the residence. When LeFever exited the residence, he struggled with the homeowner on the wooden deck. McCandless was at the deck with her gun drawn and Castellanos approached with his gun drawn. LeFever then ran off the deck and stole the homeowner's "gator" ATV. LeFever drove down the driveway toward a man and a young kid sitting in an SUV at the end of the driveway. Castellanos chased LeFever on foot and ordered him to stop. When LeFever did not stop, Castellanos shot one-time at the gator's rear tire trying to disable it. The bullet missed the tire but hit the hub cap and knocked it off. The video makes clear that Castellanos was not aiming his weapon directly at LeFever, but instead was aiming downward at the tire.

There is no evidence that Castellanos had any intent to harm LeFever. Thus, the Fourteenth Amendment claim fails as a matter of law. Castellanos also has qualified immunity because LeFever has produced no evidence whatsoever to show

that a reasonable officer would know, under the circumstances presented in this case, that he could not lawfully shoot at the tire of a vehicle in an attempt to apprehend a fleeing suspect. Stated differently, there is no caselaw to support a finding that Deputy Castellanos' action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Braun*, 983 F.3d at 1002.

### 3. False Radio Report

Finally, LeFever alleges Deputy Castellanos then made a false radio call that LeFever was armed and shots were fired, which caused other law enforcement officers to pursue LeFever and use deadly force to apprehend him. While LeFever was "seized" by the other officers, the court is not aware of any reported decision which holds that an officer who merely broadcasts false information can be held liable for a § 1983 "excessive force" claim. *See, e.g., Goolsby v. D.C.*, 317 F. Supp. 3d 582, 597 (D.D.C. 2018) ("In the absence of any case law suggesting that a dispatcher can be held liable for a police officer's use of excessive force, the Court concludes that any constitutional violation here is not clearly established.").

Simple negligence is not sufficient. *See, e.g., Young v. City of Little Rock*, 249 F.3d 730, 734 (8th Cir. 2001) (mistake of police communications operator in identifying person who was subject of arrest warrant, and arresting officer's reliance on it to arrest innocent person, did not render an arrest "unreasonable" within the meaning of the Fourth Amendment, as actions of operator and officer amounted to nothing more than negligence); *Smoak v. Hall*, 460 F.3d 768, 785 (6th Cir. 2006) ("[T]he dispatchers are not liable for their negligent transmissions or their failure to ascertain more details before sending out BOLOs [be-on-the-lookout notices] mentioning a possible robbery. In most contexts, negligence is insufficient to support a § 1983 claim. Given that there is no evidence of deliberate indifference or recklessness …, the [plaintiffs] have not established a basis to hold the [police] dispatchers accountable for a seizure in which they did not directly participate." (internal quotations and citations omitted)). *Cf. Goolsby*, 317 F. Supp. 3d at 596 (police dispatcher might violate Fourth Amendment by "maliciously misleading police officers without suspicion of wrongdoing in a manner that leads to another's detention").[27] There is no evidence before the court which would support a finding

_____

[27] *Goolsby* and the other cases cited involved § 1983 "false arrest" claims, which turn on the question of whether the arresting officers acted with probable

that Castellanos' was more than negligent in radioing that there were "shots fired," or that he ever reported that LeFever was armed. While his "shots fired" report was interpreted in this manner, Castellanos informed a dispatcher thirteen minutes later that LeFever was not armed when he was patted down. This message evidently did not reach the other Defendants.

As a matter of law, it has been that "if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest." *Bashir v. Rockdale Cty.*, 445 F.3d 1323, 1332 (11th Cir. 2006); *see Trang Nguyen v. Lokke*, No. 11-CV-3225 PJS/SER, 2013 WL 4747459, at *4 (D. Minn. Sept. 4, 2013) ("When there is no right to seize a citizen—that is, when there is no right to detain a citizen even momentarily—then there is also no right to use force against that citizen."); *see also Velazquez v. City of Long Beach*, 793 F.3d 1010, 1024 n. 13 (9th Cir. 2015) ("Like this court, all other circuits that have addressed the question prohibit a finding of excessive force predicated *only* on the fact of unlawful arrest…. That principle, however, is fully consistent with the recognition that 'the damages recoverable on an unlawful arrest claim include damages suffered because of the use of force in effecting the arrest.'" (quoting *Bashir,* 445 F.3d at 1332) (emphasis in original)); *but cf. United States v. Dawdy*, 46 F.3d 1427, 1431 (8th Cir. 1995) ("[A] defendant's response to even an invalid arrest or *Terry* stop may constitute independent grounds for arrest."); *Velazquez*, 793 F.3d at 1024 ("[F]orce used by an officer to effectuate an arrest, 'regardless of whether [the officer] had probable cause to [make the] arrest,' may still be reasonable, for instance to overcome the arrestee's forcible resistance." (quoting *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 921-22 (9th Cir.2001)).

---

cause. *See Parsons v. McCann*, 138 F.Supp.3d 1086, 1106 (D. Neb. 2015) ("A false arrest is a violation of the Fourth Amendment right against the unreasonable seizure of persons."). In contrast, a § 1983 "excessive force" claim can exist regardless of whether the officers had probable cause to make an arrest; the pivotal question, rather, is whether the amount of force the officers used in seizing the person was objectively reasonable. "Although an excessive force claim is subject to a 'reasonableness' standard under the Fourth Amendment as is a false arrest claim, the two claims require quite different inquiries." *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). "Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa." *Id.*

This line of cases suggests that if the other law enforcement officers seized LeFever in the erroneous belief they had probable cause to arrest him because of the "shots fired" radio call, and if Deputy Castellanos acted with a higher degree of culpability than negligence in making that call, then Deputy Castellanos might be held liable for LeFever's physical injuries as part of a § 1983 "false arrest" claim, as opposed to an "excessive force" claim.[28] *See Berg v. County of Allegheny,* 219 F.3d 261, 272 (3d Cir. 2000) ("As a general rule, a government official's liability for causing an arrest is the same as for carrying it out. It is thus clear that § 1983 liability for an unlawful arrest can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion." (citations omitted)); *Goolsby*, 317 F. Supp. 3d at 598  n. 6 ("As courts of appeals have recognized, damages awarded on a false arrest claim can potentially include damages related to the use of force to effectuate the arrest."); *Cty. of Los Angeles v. Mendez*, 137 S. Ct. 1539, 1548 (2017) ("[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation. Thus, there is no need to dress up every Fourth Amendment claim as an excessive force claim." (citations omitted)).

If viewed as a "false arrest" claim, there can be no liability here because the officers who apprehended LeFever had probable cause to make a warrantless arrest, independent of Castellanos' "shots fired" report. Even if other officers would not have been involved in the pursuit except for that report, LeFever's reckless driving

---

[28] The Eighth Circuit analyzed a similar claim under the Due Process Clause of the Fourteenth Amendment in *Griffin v. Hilke*, 804 F.2d 1052, 1055 (8th Cir. 1986) (holding police officer was not liable to fleeing suspect who was shot in leg by another officer after first officer transmitted erroneous broadcast which indicated suspect was armed, because record failed to disclose any evidence that first officer was more than negligent). However, the *Griffin* decision predates *Graham*, in which the Supreme Court held that "[t]he Fourteenth Amendment does not apply to excessive force claims involving arrests, which are appropriately reviewed under a Fourth Amendment analysis." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019). On initial review, the court therefore did not construe LeFever's Amended Complaint as alleging a substantive due process violation in connection with Deputy Castellanos' radio report of "shots fired." *But see Berg*, 219 F.3d at 274 ("Where a defendant does not intentionally cause the plaintiff to be seized, but is nonetheless responsible for the seizure, it may be that a due process 'deliberate indifference' rather than a Fourth Amendment analysis is appropriate." (dictum)).

was committed in the officers' presence.[29] *See Atwater v. Lago Vista,* 532 U.S. 318, 354, (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Also, "law enforcement officers may rely on information provided by others in the law enforcement community, so long as the reliance is reasonable." *Doran v. Eckold*, 409 F.3d 958, 965 (8th Cir. 2005); *see, e.g*., *Williams v. Decker*, 767 F.3d 734, 743 (8th Cir. 2014) (officers were entitled to qualified immunity where they arrested plaintiff based upon inaccurate information provided by dispatcher).

In summary, Deputy Castellanos is entitled to qualified immunity as to all claims. His brandishing or discharge of the taser was not objectively unreasonable or contrary to clearly established law. The same is true with respect to his shooting at the ATV's tire as LeFever was fleeing arrest. And, finally, although his radioing "shots fired" may have been negligence, it was not a constitutional violation and did not lead to a false arrest.

## B. Trooper Trevino

LeFever claims Trooper Trevino used excessive force in apprehending him, in violation of the Fourth Amendment, because Trevino rammed his State Patrol vehicle into the stolen pickup LeFever was driving, and when LeFever "began driving away [Trevino] pulled his 45acp and emptied the 14rd mag blindly into the vehicle [LeFever] was in." (Filing 10, p. 5.)

### 1. Ramming LeFever's Vehicle

Trevino acknowledges that though "the length of the 'seizure' created by the collision between the Nebraska State Patrol vehicle driven by Trevino and the stolen pickup truck driven by LeFever only lasted for a few seconds before LeFever continued his flight from law enforcement by backing in the direction of deputies with LCS, … this 'seizure' appears to satisfy the holding in *Hodari D*., …." (Filing 105, p. 13.) The court agrees the vehicle collision constituted a "seizure." The court also agrees with Trevino, however, that the undisputed material facts of this case, including video and audio evidence form his dashboard and body cameras (see Filing

---

[29] Defendants' statements of fact do not indicate they were aware LeFever was driving a stolen vehicle or had assaulted a civilian.

106, Exhibit A to Trevino Affidavit) clearly establish that Trevino's actions in trying to disable LeFever's vehicle with his own NSP vehicle were objectively reasonable.

LeFever led Trevino and other law enforcement officers on a pursuit along Interstate 80 at speeds topping 96 mph, through a right-of-way fence into an open field at speeds near 70 mph, back onto Interstate 80 going in the wrong direction, and finally ending in a farm field surrounded by law enforcement, more than two hours after the pursuit had begun. The video evidence shows that Trevino rammed LeFever's vehicle at a relatively slow speed, right after LeFever broke out of the farm field by driving through a fence and a ditch onto a county road.[30]

This use of force was objectively reasonable, considering that LeFever had been driving recklessly for an extended period at extremely high speeds, he reportedly had shot at Deputy Castellanos, and he obviously was intent on evading arrest. In addition, Trevino is entitled to qualified immunity because LeFever has not shown that a reasonable person in Trevino's position would have known he was violating a clearly established constitutional right. Existing caselaw fully supported Trevino's maneuver. *See, e.g., Scott*, 550 U.S. at 384 (finding it was objectively reasonable for a law enforcement officer to terminate a car chase by ramming his bumper into fleeing suspect's vehicle because the suspect "posed an actual and imminent threat to the lives of any pedestrians who might have been present, to other civilian motorists, and to the officers involved in the chase").[31] "A police officer's

---

[30] Trevino indicates that "throughout the pursuit, the suspect had presented a grave risk to the public and law enforcement due to his high rate of speed as well as the concern that he had a weapon in the vehicle." (Trevino Aff. p. 4, ¶ 22.) Additionally, Trevino explains his action by stating, "[d]ue to these concerns, I made the decision to try to disable the vehicle and apprehend the suspect. I was able to ram the suspect vehicle on its passenger side as I could see there were no passengers in the vehicle." (Trevino Aff. p. 5, ¶23)

[31] "[I]t is well known that when offenders use motor vehicles as their means of escape they create serious potential risks of physical injury to others. Flight from a law enforcement officer invites, even demands, pursuit. As that pursuit continues, the risk of an accident accumulates. And having chosen to flee, and thereby commit a crime, the perpetrator has all the more reason to seek to avoid capture." *Sykes v. United States*, 564 U.S. 1, 10 (2011), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591 (2015).

attempt to terminate a dangerous high-speed car chase that threatens the lives of innocent bystanders does not violate the Fourth Amendment, even when it places the fleeing motorist at risk of serious injury or death." *Id.*

### 2. Shooting at LeFever's Vehicle

The shooting by law enforcement at the driver of a moving car has been deemed to constitute a "seizure." *Rodriguez v. Passinault,* 637 F.3d 675, 683 (6th Cir. 2011). "Both the Supreme Court and [the Eighth Circuit] have repeatedly stated that '[a]n officer may not use deadly force against a fleeing suspect *unless* the suspect poses an *immediate and significant threat* of serious injury or death to the officer or to bystanders.'" *Wallace v. City of Alexander*, 843 F.3d 763, 769 (8th Cir. 2016) (emphasis in original; quoting *Thompson v. Murray*, 800 F.3d 979, 983 (8th Cir. 2015)).[32] "Where the officer has probable cause to believe that the suspect poses a threat of serious bodily harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Gardner*, 471 U.S. 1, 11 (1985). "[I]f the suspect threatens the officer with a weapon or if there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning is given." *Id.* at 11-12. Courts allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396-397.

Trevino's use of his firearm against LeFever occurred only moments after the collision between the two vehicles, which failed to end the pursuit, as described above. LeFever continued to use the stolen vehicle in an attempt to put other law enforcement personnel and the general public at risk, as well as evade arrest. Trevino describes the next few moments as follows:

---

[32] "Deadly force is such force that creates a substantial risk of causing death or serious bodily harm." *Church v. Anderson*, 249 F. Supp. 3d 963, 968 n. 2 (N.D. Iowa 2017) (quoting *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009), *aff'd*, 898 F.3d 830 (8th Cir. 2018). "Thus, deadly force includes shooting a person with a firearm even where that person does not die." *Id.*

> The suspect began driving backwards and to the right in the direction of where I knew deputies with the Lincoln County Sheriff's Department were located. I immediately excited my vehicle and observed the suspect stop momentarily and then drive forward to the north and east. At this time, I was very concerned that the suspect had a firearm with him and that he had previously fired it at law enforcement and may attempt to do so again. I was also concerned for the safety of the general public due to this very erratic deadly driving behavior.

(Trevino Aff. p. 5, ¶25-26) Reacting in only seconds, Trevino made the decision to fire fourteen shots towards LeFever's vehicle. Trevino says that he made this decision "to attempt to stop the suspect by use of my firearm to prevent any lives from being harmed by the suspect or his vehicle. (Trevino Aff. p. 6, ¶30 ) [T]he collision did not hinder his deadly behavior in anyway." (Trevino Aff. p. 6, ¶29)

The facts and circumstances of his case parallel the factual basis underpinning the United States Supreme Court decision in *Plumhoff v. Rickard*, 572 U.S. 765 (2014). In *Plumhoff*, law-enforcement officers in Memphis, Tennessee, were led on a high-speed car chase by Donald Rickard after he was pulled over for a traffic violation. Rickard declined to comply with officer's request to get out of the car and instead sped away. Six law enforcement officers gave chase on Interstate 40 at speeds of more than 100 mph while swerving around other vehicles on the highway. During the chase, officers' vehicles made contact with Rickard's car and even tried to pin it in a parking lot. After Pickard tried to accelerate away from law enforcement again, shots were fired and Rickard eventually crashed his vehicle, dying from a combination of gunshot wounds and injuries suffered in the car crash. The Supreme Court ruled there was no use of excessive force, stating:

> During that chase, Rickard passed more than two dozen other vehicles, several of which were forced to alter course. Rickard's outrageously reckless driving posed a grave public safety risk. And while it is true that Rickard's car eventually collided with a police car and came temporarily to a near standstill, that did not end the chase. Less than three seconds later, Rickard resumed maneuvering his car. Just before the shots were fired, when the front bumper of his car was flush with that of one of the police cruisers, Rickard was obviously pushing down on the accelerator because the car's wheels were spinning, and then Rickard threw the car into reverse 'in an attempt to escape.'…Under the circumstances at the moment when the shots were

fired, all that a reasonable police officer could have concluded was that Rickard was intent on resuming his flight and that, if he was allowed to do so, he would once again pose a deadly threat for others on the road.

*Id.* at 776-77.

Significantly, the Supreme Court in *Plumhoff* also determined it was not unreasonable under the for the officers to have fired 15 shots at the fleeing vehicle, because "[i]t stands to reason that, if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777. "[I]f lethal force is justified, officers are taught to keep shooting until the threat is over." *Id.* The Court further explained:

> Here, during the 10-second span when all the shots were fired, Rickard never abandoned his attempt to flee. Indeed, even after all the shots had been fired, he managed to drive away and to continue driving until he crashed. This would be a different case if petitioners had initiated a second round of shots after an initial round had clearly incapacitated Rickard and had ended any threat of continued flight, or if Rickard had clearly given himself up. But that is not what happened.

*Id.* Similarly, in the present case, Trevino's 14 shots were fired in quick succession, and LeFever was still driving across the field after Trevino stopped shooting.

In summary, no reasonable jury could conclude that Trevino's actions were objectively unreasonable under the circumstances. But even assuming Trevino did violate LeFever's constitutional rights, he is entitled to qualified immunity because it was not clearly established at the time that his conduct was unlawful.

No caselaw has been presented by LeFever showing that Trevino's conduct was unconstitutional "beyond debate." LeFever cites two Ninth Circuit decisions, which, in addition to not being controlling authority, are not sufficiently on point. *See Acosta v. City and County of San Francisco*, 83 F.3d 1143 (9th Cir. 1996); *Villanueva v. California*, 986 F.3d 1158 (9th Cir. 2021). "*Acosta* clearly established that an officer violates a person's constitutional rights by shooting at a slow-moving vehicle that the officer could reasonably have side-stepped to remove himself from danger." *Villanueva*, 986 F.3d at 1173 (citing *Orn v. City of Tacoma*, 949 F.3d 1167, 1174 (9th Cir. 2020)).

47

In *Acosta*, an off-duty officer pursued two suspected purse snatchers on foot until he saw them get into a waiting car, at which point he shot and killed the driver. After the jury found that the officer violated the driver's constitutional rights by using excessive force against him, the district court granted the officer's motion for judgment as a matter of law under qualified immunity. The Ninth Circuit reversed, holding that the district court was bound by the jury's factual finding that the officer did not face a threat of serious harm at the time he fired his gun, so was not entitled to qualified immunity. *See Acosta*, 8 F.3d at 1148. *Villanueva* was closer on its facts to the present case, in that the shooting was preceded by a brief high-speed chase through three red lights, but the decision was not rendered until January 2021, long after the events here. "[A] reasonable officer is not required to foresee judicial decisions that do not yet exist in instances where the requirements of the Fourth Amendment are far from obvious. *Kisela v. Hughes*, 138 S. Ct. 1148, 1154 (2018).

### C. Sheriff Kramer, Chief Dep. Kramer, and Dep. Schmidt

The court determined for purpose of initial review that LeFever had alleged sufficient facts in his Amended Complaint to state plausible Fourth Amendment "excessive force" claims against Sheriff Kramer, Chief Deputy Kramer, and Deputy Schmidt in their individual capacities for their actions in firing multiple rounds of ammunition at LeFever's vehicle.[33] The court also determined that Sheriff Kramer could be sued in his official capacity for damages because he was at the scene and, in Nebraska, a county sheriff exercises final policymaking authority for the county in the area of law enforcement. *Dean v. Cty. of Gage*, 807 F.3d 931, 941-42 (8th Cir.

---

[33] However, the court found no factual allegations to support a claim for supervisory liability against Sheriff Kramer. "Section 1983 liability cannot attach to a supervisor merely because a subordinate violated someone's constitutional rights." *Johnson v. City of Ferguson*, 926 F.3d 504, 506 (8th Cir. 2019). A supervisor may be held liable "if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Perkins v. Hastings*, 915 F.3d 512, 524 (8th Cir. 2019) (quoting *Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2001)). The plaintiff must show that the supervisor "(1) had notice of a pattern of unconstitutional acts committed by subordinates; (2) was deliberately indifferent to or tacitly authorized those acts; and (3) failed to take sufficient remedial action; (4) proximately causing injury to [the plaintiff]." *Id.* (quoting *Brewington v. Keener*, 902 F.3d 796, 803 (8th Cir. 2018).

2015); *see Brewington*, 902 F.3d at 802 (county sheriff, as final policymaker, allegedly condoned use of excessive force against fleeing arrestees).

### 1. Individual-Capacity Claims

The court now determines that these three Defendants, like Trooper Trevino, acted in an objectively reasonable manner when they fired at LeFever's vehicle. The undisputed facts show they had pursued the vehicle for approximately an hour as LeFever evaded spike strips, veered into oncoming traffic, narrowly missed law enforcement standing on the roadside, and drove in speeds in excess of 100 mph on myriad public roads. They had also received several radio reports that LeFever shot at Deputy Castellanos, and were led to believe he was armed. Chief Deputy Roland Kramer initially began firing at the tires of LeFever's vehicle when it was driving away following the collision with Trevino's vehicle. When glass began to break on LeFever's vehicle—presumably the result of shots fired by Trevino—all three of the Lincoln County Defendants began firing into LeFever's vehicle, believing they were in a gunfight. Deputy Schmidt fired shots into the vehicle after it stopped moving because he saw LeFever hunch over as if reaching for a weapon, and Schmidt then called for cover fire from the other officers because he needed to reload.

When assessing a threat, law enforcement in permitted make reasonable inferences about a suspect's future behavior based on what that officer has previously witnessed, i.e., what the officer believed. *See, Brosseau v. Haugen,* 543 U.S. 194, 197 (2004) (reasoning that it was not clear an officer shooting a suspect fleeing in a vehicle violated the Fourth Amendment's deadly-force standards when the officer believed other officers on foot were in the area, occupied vehicles were in the suspects path, and other citizens might be in the area). "It may appear, in the calm aftermath, that an officer could have taken a different course, but we do not hold the police to such a demanding standard." *Est. of Morgan v. Cook*, 686 F.3d 494, 497 (8th Cir. 2012) (citing *Gardner*, 82 F.3d at 251).

That LeFever was in fact unarmed is not dispositive. In *Thompson v. Hubbard,* 257 F.3d 896 (8th Cir. 2001), an officer, responding to a "shots fired" call, engaged in a foot chase with a suspect who the officer believed was attempting to reach for a weapon. The officer shot and killed the suspect, though no weapons were found in the suspect's possession. Affirming summary judgment in favor of defendant officer, the court reasoned that "[a]n officer is not constitutionally required to wait until he

sets eyes upon the weapon before employing deadly force to protect himself against a fleeing suspect who turns and moves as though to draw a gun." *Id.* at 899. The court stated that a "requirement that a suspect actually have a weapon would place police in a dangerous and unreasonable situation . . . whether a particular seizure is reasonable is dependent on the totality of the circumstances, and not simply on whether the suspect was actually armed." *Id.* (internal citations omitted). "[E]ven if a suspect is ultimately found to be unarmed, a police officer who reasonably believes a suspect is armed and dangerous may still employ deadly force." *Capps v. Olson*, 780 F.3d 879, 885 (8th Cir. 2015)."An act taken based on a mistaken perception or belief, if objectively reasonable, does not violate the Fourth Amendment." Id. (quoting *Loch v. City of Litchfield,* 689 F.3d 961, 966 (8th Cir.2012))

If "there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, *where feasible*, some warning has been given." *Garner*, 471 U.S. at 11-12 (emphasis added). "When the hesitation involved in giving a warning could readily cause such a warning to be the officer's last, then a warning is not feasible." *Liggins v. Cohen*, 971 F.3d 798, 801 (8th Cir. 2020) (internal citations omitted). "[W]hile the failure to warn when feasible does not automatically render use of deadly force unreasonable, it does exacerbate the circumstances and militates against finding use of deadly force objectively reasonable, *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1133 (8th Cir. 2020).

Here, Defendants were confronted with a rapidly evolving situation wherein both distance from LeFever and the loudness of the scene would have made a warning to LeFever within his vehicle futile. Moreover, given the threat of LeFever's erratic driving and perceived threat that he was armed, Defendants would have been confronted with the decision to hesitate and risk harm or death to themselves or others, or proceed in attempting to end the threat. Accordingly, it was objectively reasonable for Defendants to fire upon LeFever's vehicle without a prior warning.

LeFever has not cited to analogous precedent that would have conclusively put Defendants on notice that that their actions violated his Fourth Amendment right to be free from excessive force, and the Supreme Court's 2014 decision in *Plumhoff* established that it is not a Fourth Amendment violation for officers to continue firing at a fleeing suspect who has not surrendered or become incapacitated. Defendants therefore are entitled to qualified immunity in their individual capacities.

### 2. Official-Capacity Claims

In *Monell v. Dept. of Social Servs.*, 436 U.S. 658 (1978). the Supreme Court held that a municipality subject to an official capacity claim can be liable under § 1983. "To establish municipal liability, a plaintiff must first show that one of the municipality's officers violated her federal right." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1257 (8th Cir. 2010) (internal citations omitted). If a federal right is violated, "then a plaintiff must establish the requisite degree of fault on the part of the municipality and a causal link between municipal policy and the alleged violation." *Id.*

"[A] plaintiff may establish municipal liability through an unofficial custom of the municipality by demonstrating [*inter alia*] . . . deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct." *Malone v. Hinman*, 847 F.3d 949, 955 (8th Cir. 2017) (internal citations omitted). Further "even in the absence of an official policy or a custom, the Supreme Court has made clear that though proof of a single incident of unconstitutional activity is not sufficient to impose liability under, an unconstitutional government policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Davison v. City of Minneapolis, Minn.*, 490 F.3d 648, 659 (8th Cir. 2007).

LeFever has brought official-capacity claims against Sheriff Jerome Kramer for "poor training, excessive force, professional negligence, supervisory liability, force policy violations, municipal liability, poor judgement." (Filing 10, p. 6). The only viable claim against Sheriff Jerome Kramer arises from the fact that he tacitly authorized, approved, or condoned of his deputies' actions when he took part in firing upon LeFever's vehicle. See Memorandum and Order entered on February 4, 2021 (Filing 14), pp. 14-15.

As set forth above, Defendants' use of force was both objectively reasonable and constitutional, and therefore any official capacity claims premised on those same actions is likewise constitutional. "Where there is no underlying constitutional violation, the presence or absence of policies which permit the use of excessive force 'is quite beside the point.'" *Reynolds v. City of Little Rock*, 893 F.2d 1004, 1007 (8th Cir. 1990) (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)). Stated

another way, because there was no underlying constitutional violation, LeFever's official capacity claims must necessarily fail. *See, Roe v. Humke*, 128 F.3d 1213, 1218 (8th Cir. 1997).

## VIII. CONCLUSION

Upon careful review of the pleadings, the evidence of record, and the parties' briefs, the court finds there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. LeFever's pending motions will be denied.

Accordingly,

IT IS ORDERED:

1. Filing 101, the motion for summary judgment filed by Defendant Ivan Castellanos, is granted, and all remaining claims against said Defendant are dismissed with prejudice.

2. Filing 104, the motion for summary judgment filed by Defendant Carlos Trevino, is granted, and all remaining claims against said Defendant are dismissed with prejudice.

3. Filing 107, the motion for summary judgment filed by Defendants Jerome Kramer, Roland Kramer, Brett Schmidt, and Lincoln County, is granted, and all remaining claims against said Defendants are dismissed with prejudice.

4. Filing 127, Plaintiff's motion in opposition to Defendants' motions for summary judgment, is denied.

5. Filing 133, Plaintiff's objection to video evidence, is denied.

6. Filing 138, Plaintiff's motion to amend or replace pleadings, is denied.

7. Filing 139, Plaintiff's motion to appoint counsel, is denied.

8.  Judgment shall be entered by separate document generally providing:

    a.  Pursuant to the court's Memorandum and Order of August 3, 2020 (Filing 7), that the § 1983 claims alleged against Defendant Carlos Trevino, in his official capacity, are dismissed with prejudice;

    b.  Pursuant to the court's Memorandum and Order of February 4, 2021 (Filing 14), that:

        i.  All state-law claims alleged against Defendant Carlos Trevino, in his individual capacity, are dismissed without prejudice; and

        ii.  All claims (federal and state) alleged against Defendant Nebraska State Patrol Trooper Sergeant Elwood, in his individual capacity, are dismissed without prejudice;

    c.  Pursuant to the court's first-filed Memorandum and Order of September 13, 2021 (Filing 54), that all state-law tort claims alleged against Defendant County of Dawson, Nebraska, and Defendant Ivan Castellanos are dismissed with prejudice;

    d.  Pursuant to the court's second-filed Memorandum and Order of September February 4, 2021 (Filing 55), that all state-law tort claims alleged against Defendants Lincoln County, Jerome Kramer, Roland Kramer, and Brett Schmidt, are dismissed with prejudice; and

    e.  As stated above, that all other claims against Defendants Ivan Castellanos, Carlos Trevino, Jerome Kramer, Roland Kramer, Brett Schmidt, and Lincoln County are dismissed with prejudice.

Dated this 14th day of November, 2022.

                BY THE COURT:

                *Richard G. Kopf*

                Richard G. Kopf
                Senior United States District Judge